# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF THE REHABILITATION )    C.A. No. 2019-0175-JTL
OF SCOTTISH RE (U.S.), INC.                )

## OPINION REGARDING THE LIQUIDATION STANDARD

Date Submitted: January 20, 2022
Date Decided: April 18, 2022

Peter B. Ladig, GianClaudio Finizio, BAYARD, P.A., Wilmington, Delaware; Diane J. Bartels, Wilmington, Delaware; James J. Black, III, Jeffrey B. Miceli, Mark W. Drasnin, BLACK & GERNGROSS, P.C., Philadelphia, Pennsylvania, *Counsel for The Honorable Trinidad Navarro, Receiver for Scottish RE (U.S.), Inc.*

Michael Busenkell, GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, Delaware, *Counsel for Scottish RE (U.S.), Inc.*

Marisa R. DeFeo, Randall S. MacTough, SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware, *Counsel for Lincoln National Life Insurance Company, Lincoln Life and Annuity Company of New York and First Penn Pacific Life Insurance Company.*

Christopher Viceconte, GIBBONS P.C., Wilmington, Delaware, *Counsel for AXA Equitable Life Insurance Company, MONY Life Insurance Company of America, MONY Life Insurance Company of the Americas, LTD., and U.S. Financial Life Insurance Company, Manhattan Life Insurance Company, Manhattan Life Assurance Company of America.*

Daniel Hargraves, FREEBORN & PETERS LLP, New York, New York, *Counsel for AXA Equitable Life Insurance Company.*

Randall S. MacTough, ZARWIN BAUM DEVITO KAPLAN SCHAER TODDY, PC, Wilmington, Delaware, *Counsel for First Penn Pacific Life Insurance Company.*

Joseph B. Cicero, Gregory Stuhlman, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware, *Counsel for Berkshire Hathaway Life Insurance Company of Nebraska, Nationwide Life Insurance Company, Nationwide Life and Annuity Insurance Company, Allianz Life Insurance Company of North America, Ameritas Life Insurance Corp., Ameritas Life Insurance Corp. of New York, The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, Pacific Life Insurance Company, Pacific Life and Annuity Company, Columbus Life Insurance Company and Security Benefit Life Insurance Company.*

R. Stephen McNeill, D. Ryan Slaugh, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Counsel for Americo Financial Life and Annuity Insurance Company, Great Southern Life Insurance Company, National Farmers Union Life Insurance Company, and United Fidelity Life Insurance Company.*

William P. Bowden, Catherine A. Gaul, Ricardo Palacio, ASHBY & GEDDES, Wilmington, Delaware, *Counsel for PHL Variable Insurance Company, Nassau Life Insurance Company f/k/a Phoenix Life Insurance Company and Nassau Life and Annuity Company f/k/a Phoenix Life and Annuity Company, Protective Life Insurance Company, The U.S. Branch of Sun Life Assurance Company of Canada, Fidelity & Guaranty Life Insurance Company, Fidelity & Guaranty Life Insurance of New York.*

John C. Phillips, Jr., Paul S. Seward, PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A., Wilmington, Delaware, *Counsel for Hannover Life Reassurance Company of America and Security Life of Denver Insurance Company.*

Joseph C. Schoell, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware, *Counsel for The Canada Life Assurance Company; Homesteaders Life Company; Police and Firemen's Insurance Association.*

Kathleen M. Miller, SMITH, KATZENSTEIN & JENKINS, LLP, Wilmington, Delaware, *Counsel for The Prudential Insurance Company of America, Metropolitan Life Insurance Company, Employers Reassurance Corporation and Jackson National Life Insurance Company.*

David A. Felice, BAILEY & GLASSER, LLP, Wilmington, Delaware, *Counsel for Great American Life Insurance Company.*

John G. Harris, Peter C. McGivney, BERGER HARRIS LLP, Wilmington, Delaware, *Counsel for the Reinsurance Association of America.*

Garrett B. Moritz, Elizabeth M. Taylor, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Matthew A. Clemente, R. Bradley Drake, John Grothaus, SIDLEY AUSTIN LLP, Chicago, Illinois, *Counsel for Merced Private Claims, LLC.*

Joelle E. Polesky, STRADLEY RONON STEVENS & YOUNG, Wilmington, Delaware, *Counsel for American Council of Life Insurers.*

Travis S. Hunter, Renee M. Mosley, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Counsel for Transamerica Life Insurance Company, Allstate Life Insurance Company, State Mutual Insurance Company, American Home Life Insurance Company.*

Jarret P. Hitchings, DUANE MORRIS LLP, Wilmington, Delaware, *Counsel for NW Hall Building LP*.

Joseph Larkin, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Counsel for John Hancock Life Insurance Company (U.S.A.)*.

Barry M. Klayman, Simon Fraser, COZEN O'CONNOR, Wilmington, Delaware, *Counsel for Scottish Re (Dublin) dac*.

Kevin J. Mangan, Nicholas T. Verna, WOMBLE BOND DICKERSON (US) LLP, Wilmington, Delaware, *Counsel for Brighthouse Life Insurance Company and NonParty Brighthouse Life Insurance Company of NY, New York Life Insurance Company, New Your Life and Annuity Insurance Company, United Heritage Life Insurance Company, Shenandoah Life Insurance Company, USAA Life Insurance Company, United of Omaha Life Insurance Company, Companion Life Insurance Company, SBLI USA Life Insurance Company, Inc., S. USA Life Insurance Company, Inc., Genworth Life Insurance Company, Genworth Life and Annuity Insurance Company , Genworth Life Insurance Company of New York, USAA Life Insurance Company of New York, The Guardian Life Insurance Company of America*.

Jody Barillare, MORGAN LEWIS & BOCKIUS LLP, Wilmington, Delaware, *Counsel for Assured Guaranty (Europe) plc*.

Peter H. Kyle, John L. Reed, DLA PIPER LLP (US), Wilmington, Delaware, *Counsel for Non-Party SCOR Global Life Americas Reinsurance Company, SCOR Reinsurance Germany, Branch of SCOR SE, TOA Reinsurance Company, Limited of Tokyo, Japan, SCOR SE, SCOR Global Life Reinsurance Company of Delaware, SCOR Global Life USA Reinsurance Company, Columbian Life Insurance Company, Columbian Mutual Life Insurance Company*.

**LASTER, Vice Chancellor.**

Scottish Re (U.S.), Inc. ("SRUS" or the "Company") is a delinquent insurer. The Insurance Commissioner of the State of Delaware (the "Commissioner") successfully petitioned the court for an order placing the Company in receivership and appointing the Commissioner as receiver for the purpose of rehabilitating the Company.

The receivership has now entered its third year. The Commissioner has proposed a rehabilitation plan, but the Commissioner has not yet presented the plan for approval.

One impediment to the presentation of a rehabilitation plan has been a series of disputes about the types of information that the Commissioner must provide so that parties with claims against the Company can evaluate the plan and determine whether to file objections. Certain claimants sought the appointment of a special master to address the informational disputes.

The briefing over the appointment of a special master uncovered a deeper issue that divided the parties: They did not agree on the standard that the court would apply when determining whether to approve the rehabilitation plan. Not surprisingly, given that disagreement, they struggled to agree on what information was relevant.

The court directed the parties to confer and attempt to reach agreement on a standard for the court to apply when determining whether to approve the rehabilitation plan. To their credit, the parties reached agreement on a stipulation that specified several important dimensions of a governing test. But the parties could not agree on a critical issue: Whether the Commissioner will have to prove that he validly determined that the rehabilitation plan treats each claimant at least as well as the claimant would fare in a liquidation of the Company. This decision refers to this component as the "Liquidation Standard." It refers

to the value that a claimant would receive in liquidation as the "Liquidation Value." Thus, Liquidation Value is the minimum amount that a claimant would receive under a rehabilitation plan that satisfies the Liquidation Standard.[1]

Whether the Commissioner must satisfy the Liquidation Standard to obtain court approval for a rehabilitation plan presents an issue of first impression. Delaware's statutory scheme for evaluating a proposed rehabilitation does not address the role of the Liquidation Standard. No Delaware decision has spoken on the issue.

The proponents of the Liquidation Standard have identified a series of statutory frameworks that impose it, but all do so expressly. Delaware's statute is silent. In the absence of any express statutory language, it is not possible to construe the statutory scheme as requiring compliance with the Liquidation Standard.

The next question is whether the court should require compliance with the Liquidation Standard as a matter of common law. Approximately ten decisions from other

---

[1] In most rehabilitations, it will be impossible to calculate Liquidation Value with precision. It is trite but true to observe that valuation is as much of art as science, and estimating liquidation value requires both the use of traditional corporate valuation techniques and the challenges of assigning values to contingent claims. To compare Liquidation Value with what a claimant receives under the rehabilitation plan also requires valuing the latter, and that is an equally (if not more) challenging task that depends on the prospects of the rehabilitated business. Thus, while this decision speaks of Liquidation Value and the potential for a rehabilitation plan to satisfy the Liquidation Standard as if those concepts involved finite quantities, the actual figures will be fuzzy, and the resulting comparison requires judgment. That is one of the many reasons why a court reviews a receiver's proposed rehabilitation plan under an abuse-of-discretion standard. *See In re Rehabilitation of Scot. Re (U.S.), Inc.* (*Pre-Plan Payments*), — A.3d —, 2022 WL 971941, at \*12 & n.4 (Del. Ch. Mar. 31, 2022) (explaining reasons for application of abuse-of-discretion standard and citing authorities applying standard to application for approval of rehabilitation plan).

jurisdictions have considered whether the Liquidation Standard applies as a matter of common law. A few secondary sources mention the issue.

All of the authorities derive from a pair of Depression-era decisions arising out of the rehabilitation of Pacific Mutual Life Insurance Company of California ("Pacific Mutual"), an insolvent California insurer. The rehabilitation of Pacific Mutual generated challenges under both California and federal law, with the proceedings culminating at the state level in a decision by the Supreme Court of California. *See Carpenter v. Pac. Mut. Life Ins. Co.* (*Carpenter I*), 74 P.2d 761 (Cal. 1937), *aff'd sub nom. Neblett v. Carpenter* (*Carpenter II*), 305 U.S. 297 (1938). The Supreme Court of the United States granted certiorari to review the federal challenges, resulting in a decision that affirmed the Supreme Court of California's rulings on the federal issues. *See Carpenter II*, 305 U.S. at 305. The viability of the Liquidation Standard as a matter of common law turns on whether *Carpenter I* and *Carpenter II* (the "Pacific Mutual Decisions") impose the Liquidation Standard as a requirement for a rehabilitation plan to obtain court approval.

A close reading of the Pacific Mutual Decisions demonstrates that neither decision imposed the Liquidation Standard as a bright-line rule of law. The objectors in the Pacific Mutual Decisions advanced a variety of theories, including that the rehabilitation plan impaired their contract rights and deprived them of their property without due process of law. The trial court made found that the rehabilitation plan generated greater value than a liquidation. The Supreme Court of California interpreted the trial court's finding as a holding that each claimant had the option to receive Liquidation Value. In light of that ruling, both the Supreme Court of California and the Supreme Court of the United States

3

held that the objectors could not challenge the rehabilitation plan. Both courts held that the objectors only possessed a contractual right to receive Liquidation Value. Because the rehabilitation plan provided the objectors with the opportunity to receive that amount, the rehabilitation plan did not violate their rights.

The Pacific Mutual Decisions thus held that a rehabilitation plan that satisfied the Liquidation Standard would not give rise to constitutional challenges. The Pacific Mutual Decisions did not hold that a rehabilitation plan must meet the Liquidation Standard, nor did the Pacific Mutual Decisions hold that a court could not approve a rehabilitation plan that did not meet the Liquidation Standard. Purely as a matter of logic, a failure to meet the Liquidation Standard simply would mean that the trial court would have needed to reach the merits of the objectors' claims. It would not have dictated the fate of the plan.

In modern parlance, the Pacific Mutual Decisions were about standing. Under current standing doctrine, a plaintiff generally must establish a legally cognizable injury to have standing to sue. In substance, the Pacific Mutual Decisions held that the objectors could not point to a legally cognizable injury. The objectors accordingly could not proceed with their claims. Whether a plaintiff has standing to sue is a threshold question, independent of the merits. The Pacific Mutual Decisions did not address the merits of the plaintiffs' claims.

Courts in four jurisdictions—California, Pennsylvania, Wisconsin, and New York—have considered whether the Pacific Mutual Decisions imposed the Liquidation Standard as a requirement that a rehabilitation plan must meet. Pennsylvania has the most developed jurisprudence. Although early Pennsylvania decisions contained language

4

which, if taken out of context, could suggest that a rehabilitation plan must satisfy the Liquidation Standard, subsequent decisions have definitively rejected that notion. Wisconsin has followed Pennsylvania and definitively rejected the application of the Liquidation Standard as a bright-line rule. Like the early Pennsylvania decisions, an opinion from California contains isolated language that could be read to endorse the Liquidation Standard, but ultimately reaches a result inconsistent with the Liquidation Standard. Only a trial court ruling from New York affirmatively endorsed the Liquidation Standard, and that language appears in dictum.

There are secondary sources which posit that a rehabilitation plan must satisfy the Liquidation Standard. The sources do not provide meaningful analysis. They simply make an assertion and cite either one of the Pacific Mutual Decisions, one of the early Pennsylvania cases, or a statutory provision. Delaware lacks any statutory provision imposing the Liquidation Standard, and neither the Pacific Mutual Decisions nor the caselaw as a whole provides persuasive support for applying the Liquidation Standard as a matter of common law.

The weight of authority therefore counsels against imposing the Liquidation Standard as a common law requirement. What remains are policy rationales. Although I personally would be inclined to favor a regime that included the Liquidation Standard, reasonable minds could disagree, and a legislature enacting a statute could resolve the debate in favor of or against the Liquidation Standard.

A court is not a legislature. If compelling policy rationales favored the Liquidation Standard, and if the responses were comparatively weak, then a court might adopt the

5

Liquidation Standard as a matter of common law. But the balancing here is not so clear. Instead, as noted, Delaware's statute is silent, and the statutory schemes that impose the Liquidation Standard do so expressly. The weight of common law authority runs against imposing the Liquidation Standard as a per se rule. If Delaware is to impose the Liquidation Standard, then the General Assembly should take that step.[2]

Accordingly, when seeking court approval for the rehabilitation plan, the Commissioner will not have to demonstrate that the rehabilitation plan meets the Liquidation Standard. To have standing to advance a constitutional objection to the rehabilitation plan, a claimant will have to show that the plan does not provide the claimant with Liquidation Value. If the claimant can make that showing, then the claimant will have standing to assert its objection, and the court will consider its merits.

The need to consider the Liquidation Standard arose because of informational disputes between the parties. As a general proposition, the Commissioner must provide sufficient information about the rehabilitation plan to enable interested parties to determine whether to object. To make that determination, an interested party must be able to assess whether the rehabilitation plan will provide the interested party with Liquidation Value. Interested parties accordingly are entitled to information from the Commissioner sufficient to determine whether the Plan will provide the claimant with Liquidation Value. Based on

---

[2] Ideally the General Assembly would do so as part of a thoroughgoing modernization of Delaware's regime for insurance company receiverships. *See generally Pre-Plan Payments*, 2022 WL 971941, at \*23–24 (describing the obsolescence of Delaware's statute and calling for effort to modernize statute).

6

this ruling, the parties will confer regarding their informational disputes and present any remaining issues to the court for resolution.

## I.    FACTUAL BACKGROUND

The facts for purposes of this decision are drawn from the parties' submissions on the Liquidation Standard and other filings on the docket.

**A.    The Company**

The Company is a Delaware corporation that the Commissioner has licensed to provide life and health insurance. The Company was incorporated in 1977 and is headquartered in Charlotte, North Carolina.

The Company is a wholly owned subsidiary of Scottish Holdings, Inc., also a Delaware corporation. That entity in turn is a wholly owned subsidiary of Scottish Annuity & Life Insurance Company (Cayman) Ltd. ("SALIC"), a Cayman Islands company. SALIC is a wholly owned subsidiary of Scottish Re Group Limited ("SR Parent"), also a Cayman Islands company. The Company thus serves as an operating entity within a corporate group headed by SR Parent.

The Company is licensed as a reinsurer in sixteen states and in the District of Columbia. At one point, the Company was qualified or accredited as a reinsurer in thirty-three states.

The Company operated strictly as a reinsurer. That means that the Company entered into reinsurance agreements with primary insurers, who provide insurance to policyholders. Under a reinsurance agreement, the reinsurer agrees to pay a portion of the losses suffered by the primary insurer on identified policies in return for a premium paid

7

by the primary insurer. The primary insurer remains liable to its insureds for the losses they suffer, regardless of whether the reinsurer pays the share of the losses that it committed contractually to pay. In the language of the insurance trade, the primary insurers are called cedents, because they cede a portion of the premium associated with their reinsured policies in exchange for the reinsurer's commitment to pay the ceding insurer for a portion of its losses.

Coinsurance is a form of reinsurance in which the reinsurer takes on a proportionate share of all risks and cash flows associated with the ceded policies, subject to limited exceptions. The reinsurer thus receives a share of the premium paid by the insured to the primary insurer, and the reinsurer uses the premium to establish reserves for its share of the losses. Typically, the primary insurer is entitled to deduct certain fees and expenses, and the reinsurer is obligated to pay an allowance to the primary insurer for a share of the expenses involved in acquiring and maintaining the policy.

The Company engaged in three lines of coinsurance business: Accident and Health, Annuity, and Life.

- The Accident and Health coinsurance business involved health insurance products, mostly long-term disability insurance.

- The Annuity coinsurance business involved life insurance products that pay periodic income benefits for a specified time period or over the course of the annuitant's lifetime.

- The Life coinsurance business involved traditional life insurance products.

In addition to these lines of coinsurance, the Company provided Yearly Renewable Term Reinsurance ("YRT Reinsurance"). That product is a form of reinsurance for term

8

life insurance policies where the risk of loss, but not the permanent plan reserves, are transferred to the reinsurer along with an amount of premium that varies each year with the risk and the ages of the insureds. As a result, the premium that a cedent pays to the Company for YRT Reinsurance is independent of the premium that the insured pays to the cedent.

In addition to its reinsurance relationships with cedents, the Company entered into retrocession agreements with other reinsurers, known as retrocessionaires. Each retrocession agreement is a further reinsurance agreement in which the retrocessionaire acts as reinsurer for the Company, which acts as cedent—known in this context as a retrocedent. In return, the retrocessionaire receives a payment of premium from the Company, typically calculated as a portion of the premium that the Company received from the cedent.

## B. The Company's Financial Difficulties

In 2008, the Company stopped writing new business. It notified its existing cedents that it would no longer accept additional reinsurance risks under its existing reinsurance agreements. At that point, the Company's business went into run-off, an industry term in which an insurer curtails any activities other than what is necessary to wind up its business and affairs. The term recognizes that insurance companies typically make long-dated financial commitments that may take decades to resolve and finalize (i.e., to run off). The Company continues to manage its book of business by performing key activities and fulfilling its obligation under the agreements with its cedents and retrocessionaires.

In 2018, the Company's parent companies filed for bankruptcy. SR Parent commenced voluntary winding-up proceedings in the Cayman Islands and Bermuda. Scottish Holdings and SALIC are the debtors in a jointly administered Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. Before those filings, the parent companies had provided financial support to the Company, including another level of reinsurance. With that coverage no longer available, the Company's financial picture worsened.

Delaware law requires that an insurer file financial statements with the Commissioner. After the Company failed to file its financial statement for 2018, the Company agreed to be placed under the Commissioner's regulatory supervision. While under regulatory supervision, the Company worked with the Commissioner to assess its financial condition and determine the steps necessary for the Company to achieve and maintain solvency and otherwise conduct its business in compliance with Delaware law.

## C.    The Delinquency Proceeding

By early 2019, the Commissioner had determined that the Company was in financial distress. The Company's financial records showed an emerging negative surplus with losses projected to grow. The principal cause was losses associated with YRT Reinsurance, together with the inability of the Company's parent entities to meet their reinsurance obligations. The Company also faced other adverse developments.

On March 1, 2019, the Commissioner commenced a delinquency proceeding against the Company. *See generally* Dkt. 1 (the "Delinquency Petition"). In the Delinquency Petition, the Commissioner sought to be appointed as receiver for the purpose of

10

rehabilitating the Company. The Commissioner asserted that the Company was impaired and in an unsound condition. The Delinquency Petition detailed the adverse events that the Company had suffered. The Delinquency Petition also explained that the Company had advised the Commissioner that it would not be able to file the annual statement or the risk-based capital report required by law. The Commissioner sought an order appointing the Commissioner as receiver and directing the Commissioner to rehabilitate the Company by removing the causes and conditions that had made the delinquency proceeding necessary.

In the Delinquency Petition, the Commissioner averred that the Company's management and its board of directors believed it was in the best interests of the Company and its cedents and creditors to be placed into rehabilitation. Because the Company consented to the rehabilitation proceeding, a hearing on the Delinquency Petition was unnecessary.

By order dated March 6, 2019, this court placed the Company into receivership and appointed the Commissioner as the statutory receiver for the Company. Dkt. 18 (the "Receivership Order"). The Receivership Order determined that the Company was impaired and in an unsound condition. Among other things, the Receivership Order instructed the Commissioner to "to take such steps to remove the causes of [the Company's] impairment, unsound condition, or hazardous condition pursuant to the provisions of 18 *Del. C.* ch. 59 as he deems necessary." *Id.* ¶ 8. The Receivership Order also authorized the Commissioner "to take such actions as the nature of this cause and interests of the cedents, creditors, and stockholder of [the Company] and the public may require, subject to Court approval as required by 18 *Del. C.* ch. 59." *Id.*

**D.      The Proposed Rehabilitation Plan**

The Commissioner and the Company projected that a rehabilitation could be prepared and submitted for court approval within 120 days. They did not meet that goal.

On June 30, 2020, sixteen months after the filing of the Delinquency Petition, the Commissioner filed a proposed plan of rehabilitation. Dkt. 489 Ex. A (the "Plan"). The Commissioner subsequently received inquiries from certain cedents and retrocessionaires regarding the development of the Plan, how it would operate, and potential amendments to it. Disputes also emerged regarding the nature and types of information that the Commissioner will provide. Those disputes related to underlying disagreements about the standard that the Commissioner would need to satisfy to obtain court approval for the Plan.

The Plan rests on the Commissioner's assessment that the Company's financial difficulties arise principally from a few large cedents within the YRT Reinsurance business (the "Loss Leaders"). The Commissioner maintains that the losses from the Loss Leaders dwarf gains associated with other aspects of the YRT Reinsurance business and the three lines of coinsurance business.

The Plan would give cedents the option to continue their business relationships with the Company on modified terms. Going forward, virtually all cedents would receive payment for 87.5% of their losses in cash, with the balance paid in newly issued notes that would earn interest at 12% and could be converted to cash depending on the Company's future success.

In exchange for continuing coverage on these terms, cedents would have to pay increased premiums. Cedents in the YRT Reinsurance business would be subject to a

surcharge for changed mortality expectations resulting from the COVID-19 pandemic and other factors. The Loss Leaders would be subject to additional surcharges based on the past experience of their policies. Cedents could receive credit against rate increases if the performance of their policies met certain benchmarks. Cedents in the Company's coinsurance business would give up their right to future commission and expense allowances.

Alternatively, a cedent could elect to terminate its business relationship with the Company. Cedents in the YRT Reinsurance business who elected to terminate their relationship would receive up to 70% of the unearned premium reserve and 70% of the unpaid losses. Cedents in the coinsurance business would receive up to 25% of the unearned premium reserve and 70% of the unpaid losses. Cedents with a fully funded dedicated trust fund would receive the value of their security adjusted for the time value of early payment.

## E.  The Commissioner's Updates

Since proposing the Plan, the Commissioner has engaged in ongoing dialogue with the cedents and retrocessionaires. As a result of that dialogue, the Commissioner has proposed several adjustments to the Plan. He also has provided updates to the cedents, retrocessionaires, and the court in the form of notices filed with the court.

### 1.  The First Notice

After the Commissioner filed the Plan, many of the Company's cedents and retrocessionaires collaborated to prepare detailed questions for the Commissioner. The Commissioner also received inquiries from individual cedents and retrocessionaires.

13

In response, on September 14, 2020, the Commissioner filed a "Notice Concerning Rehabilitation Plan: Information, Explanation, Proposed Modifications, and Frequently Asked Questions." Dkt. 516 ("First Notice"). The First Notice provided (1) information about the development of the Plan, (2) explanations and illustrations addressing how the Plan would operate, and (3) answers to frequently asked questions. The First Notice also included proposed modifications to the Plan. All of the modifications were technical in nature.

In the First Notice, the Commissioner stated that he "anticipate[d] that there will be additional modifications based on discussions with interested parties and the Receiver intends to file an Amended Plan at a later date." *Id.* at 10. He emphasized that the Plan remained subject to comment. *Id.* at 2.

### 2.     The Second and Third Notices

On November 9, 2020, the Commissioner filed the second and third notices concerning the Plan. Dkts. 531 (the "Second Notice"), 532 (the "Third Notice"). The notices had different purposes, presumably explaining why the Commissioner filed separate notices on the same date.

The Second Notice requested information from the Company's cedents. It required that each cedent provide (1) information about its reinsurance agreements with the Company; (2) an accurate and up-to-date reporting on offset and unpaid loss amounts; and (3) requests for lists of disputed claims, treaties, and statement of reserves. The Commissioner requested all information by November 20, 2020.

The Third Notice provided answers to a set of questions that the Commissioner had not addressed in the First Notice. The Commissioner again stressed that the Plan remained subject to change.

### 3. The Fourth Notice

On January 8, 2021, the Commissioner filed a fourth notice. Dkt. 534 (the "Fourth Notice"). The Fourth Notice summarized information that the Commissioner had exchanged between two teams of actuarial consultants, one hired by the Commissioner and the other by the Loss Leaders. As with the other notices, the Commissioner again stressed that the Plan remained subject to change.

### 4. The Fifth Notice

On January 15, 2021, the Commissioner filed a fifth notice. Dkt. 535 (the "Fifth Notice"). The one page notice simply reported that the Commissioner had provided an amended draft of the Plan to cedents and retrocessionaires.

### 5. The Amended Plan

On March 16, 2021, the Commissioner filed an amended version of the Plan. Dkt. 555 Ex. A. Most of the changes were technical in nature or reflected minor edits to language. The most significant modification was the inclusion of additional guidance on the handling of claims. *Id.* § 8.4.2. The Commissioner confirmed that the amended Plan was not final. Dkt. 555 at 1–2.

## E. The Request For A Special Master

Throughout the case, disputes have arisen about the parties' obligations to provide information. Claimants have complained about the Commissioner's failure to respond to

15

information requests. *See, e.g.*, Dkt. 540. The Commissioner has complained about the failure of certain claimants to respond to his inquiries. *See* Dkt. 556.

On February 26, 2021, certain cedents and retrocessionaires moved for the appointment of a special master to oversee the exchange of information. Dkt. 540. They argued that a special master was necessary because of the Commissioner's failure to provide "essential information" and to address "fundamental disagreements . . . over what information" the Commissioner was obligated to provide. *Id.* ¶ 3.

On March 3, 2021, Merced Private Claims LLC ("Merced"), a creditor of the Company, joined the motion for the appointment of a special master. Dkt. 547. Merced provided a detailed history of the difficulties it had experienced obtaining information from the Commissioner. *Id.* ¶¶ 3–8.

On March 16, 2021, the Commissioner filed its response to the motion for the appointment of a special master. Dkt. 556. The Commissioner argued that the information request implicated core legal issues and that the claimants did not have a right to the information they were seeking. *Id.* ¶ 14.

The court conducted a hearing on the issue of whether to appoint a special master. It quickly became apparent that a fundamental disagreement existed over the standard that the court would apply when deciding whether to approve the Plan. The lack of agreement in turn contributed to the informational disputes. *See* Dkt. 572 at 41–42**.**

By letter dated June 11, 2021, the court denied the motion for the appointment of a special master. Dkt. 589 at 1 ("Direction Letter"). The court explained that the scope of discovery would turn on "the requirements for confirming the rehabilitation plan." *Id.* at 4.

16

The court therefore determined it would be "helpful if the court determines in the first instance what standard it will apply when approving the plan." *Id.* at 2. The court directed the parties to confer on the appropriate standard to apply and to submit simultaneous briefs presenting any points of disagreement. *Id.* at 6.

On July 15, 2021, the parties submitted a stipulation in which they commendably agreed on several issues. Dkt. 605. It stated:

> The standard ("Standard") to be applied by the Court to determine whether to approve [the Plan] shall include the following components:
>
> A. The Plan takes steps to remove the causes and conditions that have made the rehabilitation of SRUS necessary;
>
> B. The Plan is fair, reasonable, and in the best interests of the SRUS creditors and public; and
>
> C. The Plan is feasible.
>
> The burden of proof shall be preponderance of the evidence, and the Receiver's judgment in determining whether the Plan meets each component of the Standard is entitled to broad deference from the Court.

*Id.* at 2. The parties could not agree on whether the Plan also had to satisfy the Liquidation Standard. *See id.*

## F.  Briefing And Argument

As requested, the Commissioner and the claimants who were involved in the special master dispute submitted briefing on the Liquidation Standard. The Commissioner argued that the Liquidation Standard did not operate as a bright-line rule that the Plan had to meet in order to be approved. Dkt. 609.

A group of fifty-seven cedents and five retrocessionaires argued that the Commissioner had to prove that the Plan met the Liquidation Standard. *See* Dkt. 610 Exs. A, B (listing cedents and retrocessionaires). Collectively, the fifty-seven cedents and five retrocessionaires accounted for more than 80% of the Company's retroceded business. Dkt. 638 at 1 n.1. Merced joined in their brief. Dkt. 611.

A separate group of seven retrocessionaires (the "Objecting Retrocessionaires") joined the Commissioner in arguing against the Liquidation Standard. Dkt. 608. The Objecting Retrocessionaires also disputed whether the court should rule on the applicability of the Liquidation Standard. They pointed out that no party had filed a motion for relief on that issue, which was true but irrelevant. The informational disputes implicated the Liquidation Standard. Moreover, a court is not forbidden from acting unless a party makes a motion. Rule 16(a) contemplates that a court may take steps to "formulat[e] and simplif[y] the issues" and to address "[s]uch other matters as may aid in the disposition of the action." Ct. Ch. R. 16(a)(1), (5). Commentary on Federal Rule of Civil Procedure 16 explains that "case management [is] an express goal of pretrial procedure." 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1521 (3d ed. 2010), Westlaw (database updated Apr. 2022). The Advisory Committee's note to the federal rule states:

> Empirical studies reveal that when a trial judge intervenes personally at an early stage to assume judicial control over a case and to schedule dates for completion by the parties of the principal pretrial steps, the case is disposed of by settlement or trial more efficiently and with less cost and delay than when the parties are left to their own devices.

Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. To that end, although Rule 16 still refers to a "pretrial conference," the emphasis has shifted "away from a conference focused solely on the trial and toward a process of judicial management that embraces the entire pretrial phase." *Id.* The commentary recognizes that "[t]he timing of any attempt at issue formulation is a matter of judicial discretion." *Id.*

The Objecting Retrocessionaires also argued that the procedures that the court had implemented were not sufficient to enable the court to make a decision on the Liquidation Standard. They pointed out that the Company had approximately 160 cedents and thirty retrocessionaires, but only a subset had participated in the motion for the appointment of a special master. Dkt. 608 at 10–11.

The court disagreed with the procedural objection, which seemed designed to create a point for appeal rather than to advance the process of issue formulation and resolution. The court had placed the Direction Letter on the docket, making it available to anyone with an interest in the proceedings. The Direction Letter invited briefing from the Commissioner and the claimants involved in the dispute over the special master, but it did not limit briefing to those parties. There was also no reason to believe that the participating cedents and retrocessionaires could not adequately represent the interests of all claimants.

To defuse the issue, the court issued an order requiring that the Commissioner provide notice to every claimant. Dkt. 623. The order invited non-duplicative opening briefs from any new parties and provided for the filing of reply briefs. *See id.* ¶¶ 3, 7. The additional procedures do not appear to have resulted in any additional cedents,

19

retrocessionaires, or other claimants joining the briefing process. Those claimants who were sufficiently motivated to participate already were participating.

The court separately received a motion by the American Council of Life Insurers (the "Council") to file briefs as amicus curiae. The Council describes itself as a trade association with more than 240 member companies who represent 95% of the life insurance industry's assets in the United States. The court granted the application. Dkt. 632. At least 122 of the Council's 240 members are in privity with the Company as cedents or retrocessionaires, including at least fifty of the cedents and retrocessionaires who argued for the application of the Liquidation Standard as a bright-line rule.[3] Not surprisingly, the Council joined its members in calling for the application of the Liquidation Standard as a bright-line rule. Dkt. 633. To simplify the discussion, this decision refers to the Council, the fifty-seven cedents and five retrocessionaires that took the same position, and Merced as the "Proponents."

The parties filed reply briefs. *See* Dkts. 636–39. The court heard oral argument on January 20, 2022. Dkt. 670.

---

[3] When the court granted the Council's request, the court was not aware of the substantial overlap between the Council's members and the cedents and retrocessionaires already advocating for the application of the Liquidation Standard. Had the court known, it might have reached a different conclusion regarding the Council's ability to add value as an amicus. In the end, the principal reason for concern—the risk of duplicative submissions—did not manifest itself. The Council and the other proponents of the Liquidation Standard took care not to make overlapping arguments, and the court appreciates their efforts.

## II.    LEGAL ANALYSIS

The issue for decision is whether the Commissioner must satisfy the Liquidation Standard to obtain court approval for the Plan. Answering that question will help resolve the informational disputes. It also will assist the Commissioner in designing a plan that can receive court approval, and it will provide guidance to any claimants who may be evaluating whether to object to the Plan.

The Proponents maintain that the Plan must satisfy the Liquidation Standard to obtain court approval. The Commissioner opposes this bright-line interpretation. He argues that he has discretion to consider whether some claimants will receive less than Liquidation Value when formulating the Plan, and he represents that he will do so, but he does not view the Liquidation Standard as a per se requirement that the Plan must satisfy.

This decision concludes that in a delinquency proceeding under Delaware law, the Liquidation Standard does not operate as a per se requirement for plan approval. Rather, a claimant who can show that the Plan does not provide that claimant with Liquidation Value has established an injury sufficient to support a challenge to the Plan. Put conversely, if the Plan provides a claimant with Liquidation Value, then the claimant has not suffered an injury sufficient to support a challenge to the Plan.

A showing that the Plan does not provide a claimant with Liquidation Value does not preclude the court from approving the Plan. The court must take into account whether the Plan fails to provide Liquidation Value to claimants when determining whether approving the Plan is in the best interests of the Company's claimants and the public. But

the court can approve the Plan, even if it does not provide some claimants with Liquidation Value.

From a claimant's perspective, whether the Plan provides the claimant with Liquidation value affects whether the claimant can raise a constitutional objection to the Plan and whether the court must evaluate the merits of that challenge. Precedent demonstrates that there are many challenges that a claimant can advance. Common challenges under the United States Constitution include:

- A claim that the plan unjustifiably impairs the claimant's contract rights in violation of the Contracts Clause of the United States Constitution, which provides that "No state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 5.

- A claim that the plan results in an unconstitutional taking of the claimant's property in violation of the Takings Clause of the United States Constitution, which provides, "nor shall private property be taken for public use, without just compensation." *Id.* amend. V.

- A claim that the plan deprives the claimant of property without due process of law, in violation of the Due Process Clause of the United States Constitution, which provides, "nor shall any State deprive any person of . . . property, without due process of law." *Id.* amend. XIV, § 1.

- A claim that the plan deprives the claimant of equal protection under the laws, as guaranteed by the Equal Protection Clause of the United States Constitution, which provides that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." *Id.*

*See, e.g.*, *Carpenter I*, 10 P.2d at 774 (noting that the appellants contended that the rehabilitation plan, the statutes authorizing it, and the procedures by which it was adopted "were unconstitutional in that they violated the due process, equal protection of the law, and the contract clauses of the Federal Constitution").

Extensive case law governs each potential challenge, but to be able to assert any of the challenges, a claimant must show that the rehabilitation plan substantially impairs the claimant's contract rights. The adverb "substantially" is important, because insubstantial impairments to contract rights are part of the frictional costs of rehabilitation and do not warrant an objection.

If the Plan satisfies the Liquidation Standard and thereby provides the claimant with Liquidation Value, then the claimant's rights are not substantially impaired. Without a substantial impairment, the claimant has not been injured by the Plan. Without a legally cognizable injury, a claimant who receives Liquidation Value lacks standing to object.

Whether a claimant will receive Liquidation Value therefore remains a central issue in this proceeding, even though the Liquidation Standard does not operate as a per se requirement for plan approval. Consequently, the Commissioner must provide claimants with information sufficient to enable each claimant to assess whether the Plan will provide the claimant with Liquidation Value.

## A.      Delaware's Statutory Regime

The first place to look when determining whether the Commissioner must satisfy the Liquidation Standard to obtain court-approval for the Plan is Delaware's statutory regime for the liquidation and rehabilitation of delinquent insurers. In 1953, the General Assembly enacted the Delaware Uniform Insurers Liquidation Act (the "DUILA"), which is a version of the Uniform Insurers Liquidation Act (the "Uniform Act"). The National Conference of Commissioners on Uniform State Laws (the "NCCUSL") promulgated the Uniform Act in 1939 in an effort to promote uniformity across the several states in the

important area of insurance company receiverships. The Uniform Act represented the earliest effort to create a consistent state-by-state regime for insurance company receiverships. *See Commissioner's Prefatory Note*, *Uniform Insurers Liquidation Act*, 9B Unif. L. Annotated 284, 286 (1966).

NCCUSL withdrew the Uniform Act in 1981 due to its obsolescence. *Pre-Plan Payments*, 2022 WL 971941, at \*21. Notwithstanding the Uniform Act's withdrawal, twenty-three jurisdictions still use at least parts of it. *Id.* Delaware is one of those states. Although the General Assembly has made minor changes to the DUILA over the years, the act persists substantially in its original form.

The DUILA does not specify that a rehabilitation plan must satisfy the Liquidation Standard to receive court approval. Indeed, the DUILA barely specifies a test for a rehabilitation plan at all.

The closest the DUILA comes to a test is language that appears in a section titled "Order of rehabilitation; termination." 18 *Del. C.* § 5910. Subsection (a) states:

> An order to rehabilitate a domestic insurer shall direct the Commissioner forthwith to take possession of the property of the insurer and to conduct the business thereof and to take such steps toward removal of the causes and conditions which have made rehabilitation necessary as the court may direct.

*Id.* § 5910(a). Although framed in terms of what an "order to rehabilitate . . . shall direct," the framing implies that the operative test is whether the court finds that the Commissioner has abused his discretion in determining that the plan takes sufficient action "toward removal of the causes and conditions which have made rehabilitation necessary." *See id.*; *Pre-Plan Payments*, 2022 WL 971941, at \*12 & n.4 (establishing that abuse of discretion

24

is the proper standard of review). The standard thus connects the test for a successful rehabilitation to the removal of the specific conditions that warranted rehabilitation in the first place. The standard does not require more. The provision plainly does not mandate compliance with the Liquidation Standard.

Additional relevant language appears in a section titled "Commencement of delinquency proceedings." 18 *Del. C.* § 5903. That section states:

> The Commissioner shall commence any such proceeding by application to the court for an order directing the insurer to show cause why the Commissioner should not have the relief prayed for. On the return of such order to show cause and after a full hearing, the court shall either deny the application or grant the application, together with such other relief as the nature of the case and the interests of the policyholders, creditors, stockholders, members, subscribers or the public may require.

*Id.* The section thus envisions that the court would grant relief that serves the interests of the policyholders, creditors, stockholders, members, subscribers, and the public. Reframed in terms of the approval of a rehabilitation plan, the section envisions that a court would approve a rehabilitation plan unless the Commissioner abused his discretion in determining that the plan is in the best interests of the Company's policyholders, creditors, stockholders, members, subscribers, and the public. Once again, the provision does not mandate compliance with the Liquidation Standard.

The parties draw different inferences from the breadth and generality of these provisions. The Commissioner takes them at face value and interprets them as granting broad discretion to the Commissioner and the court. The Proponents infer that such broad discretion must have some limitations, and they infer the need for the Liquidation Standard as one such limitation.

25

To support applying the Liquidation Standard, the Proponents note that Section 5903 identifies that a goal of delinquency proceedings is protecting the interests of policyholders, creditors, stockholders, members, subscribers, and the public, but not the interests of the insurer itself. The Proponents reason that by omitting the insurer, the General Assembly sought to make clear that preserving an insurer's existence through rehabilitation is not an independent statutory goal and should not justify impairing the rights of creditors. *See* Dkt. 633 at 4–7.

The Proponents also advance arguments based on the structure of the DUILA. They point out that the DUILA authorizes the Commissioner to file a delinquency proceeding "for the purpose of liquidating, rehabilitating, reorganizing or conserving [an] insurer." 18 *Del. C.* § 5901(3). The statute does not define these terms, but the Proponents perceive a hierarchy of proceedings, each more onerous than its predecessor.

- In a conservatorship, also called regulatory supervision, the Commissioner takes possession of the delinquent insurer to preserve the status quo while the receiver evaluates the insurer's financial status.

- In a rehabilitation, the Commissioner seeks to remedy the problems that led to the delinquency proceeding so as to preserve the business of the delinquent insurer and allow it to emerge from receivership as a going concern.

- In a reorganization, the Commissioner makes significant changes to the legal structure of the insurer.

- In a liquidation, the Commissioner winds up the business of the delinquent insurer, marshals its assets, and makes payments to its claimants, including a liquidating distribution to equity holders, if sufficient funds are available. The delinquent insurer does not continue as a going concern.

The Proponents argue that under a structure in which liquidation is the most extreme alternative, any lesser alternative should not result in the insurer's creditors receiving worse treatment than under the harshest alternative.

The Proponents' arguments are clever and have some surface appeal, but they do not overcome the fact that the DUILA does not expressly impose the Liquidation Standard. As a matter of statutory law, Delaware does not require that the Commissioner satisfy the Liquidation Standard to obtain court approval for the Plan.

## B.   Other Regimes

Although the DUILA does not require that the Plan meet the Liquidation Standard, there are other regimes governing complex financial entities which do impose that requirement. The Proponents discuss these regimes, seemingly seeking to establish a consensus that modern frameworks for addressing financially distressed entities incorporate the Liquidation Standard. The Proponents have shown a prominent trend towards incorporating the Liquidation Standard, but their authorities teach a different lesson: When a regime incorporates the Liquidation Standard, it does so expressly.

### 1.   The Insurer Receivership Model Act

Since the promulgation of the Uniform Act and Delaware's adoption of the DUILA, the National Association of Insurance Commissioners (the "NAIC") has promulgated two more recent model acts: the Insurers Rehabilitation and Liquidation Model Act (the "IRLA") and the Insurer Receivership Model Act (the "IRMA"). Like the Uniform Act, the IRLA does not address the application of the Liquidation Standard. The IRMA,

however, expressly requires that any rehabilitation plan comply with the Liquidation Standard.

In 1968, the NAIC promulgated the IRLA as an updated version of the Uniform Act. The IRLA carried over much of the terminology and concepts from the Uniform Act, while making changes designed to clarify and improve it. Thirty-one states plus the District of Columbia and Puerto Rico have enacted components of the Model Act. Delaware has not. *See Pre-Plan Payments*, 2022 WL 971941, at \*22.

The IRLA does not specify that a rehabilitation plan must meet the Liquidation Standard. The pertinent section states:

> If the rehabilitator determines that reorganization, consolidation, conversion, reinsurance, merger or other transformation of the insurer is appropriate, the rehabilitator shall prepare a plan to effect such changes and shall file it with the Court within six (6) months after the entry of the rehabilitation order or such further time as the Court may allow for good cause. *Upon application of the rehabilitator for approval of the plan, and after such notice and hearings as the court may prescribe, the court may either approve or disapprove the plan proposed, or may modify it and approve it as modified. Any plan approved under this section shall be, in the judgment of the court, fair and equitable to all parties concerned*.

IRLA § 18(E) (emphasis added). The IRLA thus contemplates only that the court must determine that the plan is "fair and equitable to all parties concerned."[4]

The IRLA also expressly states that a rehabilitation plan may affirm, disaffirm, or alter contract rights. After referencing the powers generally available to a rehabilitator, the

---

[4] This decision quotes from the 2000 version of the IRLA. It is not publicly available, but can be obtained from the NAIC.

IRLA states that those powers include "the power to affirm or disaffirm any contract to which the insurer is a party." *Id.* The next sentence states: "However, the rehabilitator of an insurer may, as part of a court approved plan of rehabilitation, modify or restructure the policies or contracts of insurance." *Id.* The IRLA does not specify that when taking those actions, the rehabilitator must ensure that the claimant receives Liquidation Value.

The IRMA takes a different approach. Promulgated in 2005 by the NAIC, the IRMA is an updated version of the IRLA. It goes far beyond the DUILA, the Uniform Act, and the IRLA in specifying the requirements that a rehabilitation plan must meet before obtaining court approval.

The IRMA begins with the "fair and equitable" standard from the IRLA, then adds the seemingly uncontroversial and implicit requirement that the plan be "in compliance with applicable law." The operative provision states:

> The rehabilitator shall prepare and file a plan to effect rehabilitation with the receivership court within one year after the entry of the rehabilitation order or such further time as the receivership court may allow. Upon application of the rehabilitator for approval of the plan, and after such notice and hearings as the receivership court may prescribe, the receivership court may either approve or disapprove the plan proposed, or may modify it and approve it as modified. *Any plan approved under this section shall be in compliance with applicable law and fair and equitable to all parties concerned.*

IRMA § 403(A).

The IRMA then states that any plan must meet a series of requirements, with the Liquidation Standard taking pride of place. The plan must:

> (1) Except as provided at Subsection E, provide no less favorable treatment of a claim or class of claims than would occur in liquidation, unless the holder of a particular claim or interest agrees to a less favorable treatment of that particular claim or interest;

(2) Provide adequate means for the plan's implementation;

(3) Contain information concerning the financial condition of the insurer and the operation and effect of the plan, as far as is reasonably practicable in light of the nature and history of the insurer, the condition of the insurer's books and records and the nature of the plan; and

(4) Provide for the disposition of the books, records, documents and other information relevant to the duties and obligations covered by the plan.

*Id.* § 403(C).

Subsection 403(C)(1) thus generally requires compliance with the Liquidation Standard. That provision is subject to Subsection 403(E), which authorizes the following limited departures from the Liquidation Standard:

A plan may designate and separately treat one or more separate sub-classes consisting only of those claims within these classes that are for or reduced to de minimis amounts. A de minimis amount shall be any amount equal to or less than a maximum de minimis amount approved by the receivership court as being reasonable and necessary for administrative convenience.

*Id.* § 403(E). Unlike the DUILA, the Uniform Act, and the IRLA, the IRMA thus specifies that a rehabilitation plan must meet the Liquidation Standard, except for de minimis departures that are reasonable and necessary for administrative convenience.

In the sixteen years since its promulgation, the IRMA has not met with widespread acceptance. As of summer 2021, only two states—Texas and Utah—have adopted the IRMA in its entirety. Four other states—Maine, Missouri, Oklahoma, and Tennessee—have adopted portions of the IRMA. *Pre-Plan Payments*, 2022 WL 971941, at *23.

Delaware has not adopted the IRMA. In fact, there is some evidence of a conscious decision not to enact it. In 2005, when the NAIC solicited feedback on the IRMA, then-

Delaware Senate Majority Leader Harris B. McDowell responded with comments.[5] At the time, Senator McDowell served as a member of the Senate Insurance & Elections Committee. Senator McDowell regarded many of the changes that IRMA incorporated as "significant and fundamental changes in public policy," and he expressed concern that the NAIC was "trying to force policy upon those of us in the legislatures who were elected to write policy." *Id.*

The IRMA's express implementation of the Liquidation Standard shows that the NAIC, a leading industry organization, views requiring compliance with that standard as sound policy. The fact that the IRMA includes an express provision, and the contrast with the more general standards found in the DUILA, the Uniform Act, and the IRLA, also indicates that explicit statutory language was necessary to implement it.

### 2. The Bankruptcy Code

The Proponents next cite the requirements of federal bankruptcy law (the "Bankruptcy Code"). Although insurance companies domiciled in the United States cannot seek protection under federal bankruptcy law, *see* 11 U.S.C. §§ 109(b), (d), this court has looked to bankruptcy law when considering an issue that the DUILA did not expressly address. *See In re Liquid. of Freestone Ins. Co.*, 143 A.3d 1234, 1240 (Del. Ch. 2016) (looking to bankruptcy law "to find guidance in a seemingly similar legal scenario").

---

[5] *See* Fin. Condition (E) Comm., Nat'l Ass'n of Ins. Comm'rs, *Fall 2005 National Meeting*, 2005 NAIC Proc. 3d Quarter 461, 536, *available at* 2005 WL 3626003 (letter from Senator McDowell to the NAIC's Financial Condition (E) Committee regarding the IRMA).

Courts in other jurisdictions likewise have looked to bankruptcy law for guidance.[6] When doing so, this court has acknowledged that "[a]ny potential doctrinal transplant must be approached with caution." *Freestone*, 143 A.3d at 1353. Courts have declined to import the rules that apply in bankruptcy when inconsistent with the goals of insurance liquidation or a state's statutory scheme.[7]

Section 1129 of the Bankruptcy Code sets forth the minimum requirements for a bankruptcy court to confirm a plan of reorganization. One of the requirements is the following:

> With respect to each impaired class of claims or interests-
>
> (A) each holder of a claim or interest in such class
>
>> (i) has accepted the plan; or
>>
>> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, *that is not less than the amount that such holder would so receive or retain*

---

[6] *See, e.g.*, *White v. State ex rel. Block*, 597 P.2d 172, 174–76 (Alaska 1979) (examining principles of bankruptcy law in reversing judicially imposed priority scheme); *Com. Nat'l Bank v. Superior Ct.*, 17 Cal. Rptr. 2d 884, 900 (Cal. Ct. App. 1993) ("Principles of bankruptcy law may be considered as instructive in the context of insurance insolvency where analogous procedures and issues are concerned."); *Koken v. Fid. Mut. Life Ins. Co. (Fidelity I)*, 803 A.2d 807, 817 (Pa. Commw. Ct. 2002) ("Despite the already noted statutory differences between the Bankruptcy Code and [Pennsylvania insurance law], we would be unwise not to look to bankruptcy cases for guidance.").

[7] *See, e.g.*, *Bluewater Ins. Ltd. v. Balzano*, 823 P.2d 1365, 1376 (Colo. 1992) (declining to apply offset rules from bankruptcy or to analogize to bankruptcy principles because "analogies to bankruptcy cases are inapposite, as are cases from other jurisdictions which have analogized insurance company insolvencies to bankruptcy"); *Bennet v. Glacier Gen. Assurance Co.*, 748 P.2d 464, 466 (Mont. 1987) ("Intervenors urge this Court to apply bankruptcy law by analogy to the situation now before us. We see no reason to reach outside the liquidation act for our determination.").

*if the debtor were liquidated under chapter 7 of this title on such date*
*. . . .*

11. U.S.C. § 1129(a)(7) (emphasis added). Commonly called the "best-interests test," Section 1129(a)(7) is a manifestation of the Liquidation Standard.

The incorporation of the best-interests test in the Bankruptcy Code suggests that requiring compliance with the Liquidation Standard would be a sound rule. But the express inclusion of the best-interests test also suggests that such a requirement should be imposed by statute. In contrast with the Bankruptcy Code, the DUILA is silent.

### 3. Additional Frameworks

The Proponents also cite other frameworks, including (1) the Dodd-Frank Wall Street Reform and Consumer Protection Act, (2) a globally accepted framework for insurance supervision adopted by the International Association of Insurance Supervisors, (3) the Financial Stability Board's 2014 publication titled "Key Attributes of Effective Resolution Regimes for Financial Institutions," and (4) two separate but related international agreements with the European Union and United Kingdom on prudential measures for insurance and reinsurance receiverships, known as the "Covered Agreements."[8] Not all of the sources deal with insurance companies. All either require or recommend compliance with the Liquidation Standard or its equivalent.

---

[8] *See* Bilateral Agreement Between the United States of America and the United Kingdom on Prudential Measures Regarding Insurance and Reinsurance, U.S.-U.K., Dec. 18, 2018, U.S. Dep't of Treasury, Treas. SM-579, 2018 WL 6630187, *available at* https://home.treasury.gov/policy-issues/financial-markets-financial-institutions-and-fiscal-service/federal-insurance-office/covered-agreements/us-uk-covered-agreement; Bilateral Agreement Between the European Union and the United States of America on

Once again, the lesson is the same. The fact that these regimes incorporate or recommend compliance with the Liquidation Standard suggests that such a rule represents good policy. At the same time, the fact that each regime expressly references the Liquidation Standard reinforces the inference that in the absence of express language, compliance with the Liquidation Standard is not part of the governing test.

## C.    The Caselaw

The Proponents next turn to the caselaw. In theory, the DUILA might be silent on the application of the Liquidation Standard because a rehabilitation plan must satisfy that test as a matter of common law. The existence of a common rule also would lessen the weight of the inference to be drawn from the express references to the Liquidation Standard in other statutory schemes. Legislators sometimes choose to codify a common law doctrine, thereby clarifying the law without necessarily changing the rule that otherwise would apply. If the Liquidation Standard already applies as a matter of common law, then perhaps that is all that the drafters of the other schemes were doing.

A deep dive into the caselaw reveals that the Liquidation Standard is not a common law requirement. Relatively few decisions address the Liquidation Standard. The seminal authorities are the Pacific Mutual Decisions. Courts in four jurisdictions—Pennsylvania, Wisconsin, California, and New York—have issued subsequent decisions that address

---

Prudential Measures Regarding Insurance and Reinsurance, U.S.-Eur. Union, Sept. 22, 2017, T.I.A.S. 18-0404, *available at* https://home.treasury.gov/policy-issues/financial-markets-financial-institutions-and-fiscal-service/federal-insurance-office/covered-agreements/us-eu-covered-agreement.

whether a rehabilitation plan must satisfy the Liquidation Standard. Pennsylvania has engaged with the issue to the greatest extent. Ultimately, only a single opinion—a trial court ruling from New York—applies the Liquidation Standard as a matter of common law, and that ruling is dictum because the court reached the same outcome on statutory grounds. The Liquidation Standard thus does not have a sound common law foundation.

### 1.    The Pacific Mutual Decisions

All of the authorities that discuss the Liquidation Standard trace its origins to the Pacific Mutual Decisions. Because of their significance, it is important to discuss them in detail.

### a.    The Trial Court Ruling

The Pacific Mutual Decisions addressed appeals from a trial court ruling that approved a rehabilitation plan for Pacific Mutual, an insurance company domiciled in California that sold life, health, and accident insurance. *Carpenter II*, 305 U.S. at 299. Pacific Mutual suffered financial difficulties because it charged inadequate premiums for noncancelable accident and health policies. *Carpenter I*, 74 P.2d at 767. By 1935, the company's reserves for its accident and health policies were plainly inadequate. The company's traditional life insurance business, however, remained quite profitable. *Id.* at 767, 776.

In 1936, the Insurance Commissioner of California (the "California Commissioner") obtained an order appointing him as receiver to rehabilitate Pacific Mutual. *Carpenter II*, 305 U.S. at 299. The California Commissioner determined that Pacific Mutual had a deficiency of $23 million in its reserves for noncancelable accident

and health policies, but its reserves for other policies were sound. The California Commissioner also determined that on a book value basis, Pacific Mutual had assets of $200 million against liabilities of $600 million. But the California Commissioner also concluded that Pacific Mutual had significant value as a going concern, and it had issued policies covering the lives and health of over 200,000 people, plus accident and health policies covering another 75,000 people.

The California Commissioner sought court approval for a rehabilitation plan that involved the creation of a new company, the assumption by the new company of substantially all of the assets and certain liabilities of Pacific Mutual, and the liquidation of Pacific Mutual. Under the plan, the California Commissioner would act as the receiver for the new company and the liquidator for Pacific Mutual.

Under the rehabilitation plan, the new company assumed all of Pacific Mutual's policies with no changes in terms, except for the noncancelable accident and health policies. A holder of a noncancelable policy had two options. The first option was to receive a restructured policy from the new company that charged the same premium but provided only 20–30% of the benefits, with the possibility for improved benefits based on the new company's performance. The second option was to reject the new policy, file claim against Pacific Mutual, and receive a lump-sum payment of cash calculated to reflect what they would have received if Pacific Mutual had been liquidated. *Carpenter I*, 74 P.2d at 768, 770–71. Under the rehabilitation plan, the new company undertook to fund the cash payment. *Id.* at 770–71. Through this complex structure, the holder of a non-cancelable policy had the option to receive Liquidation Value. The Commissioner argued that the

rehabilitation plan would enable the business of Pacific Mutual to continue without interruption and preserve its intangible assets, including the goodwill associated with the business. Other interested parties proposed different plans, including a traditional liquidation. *Id.* at 768–69.

The trial court held an evidentiary hearing and approved the California Commissioner's plan. The trial court agreed that that "the intangible assets of the old company were worth 'several million dollars'" and that the plan would "preserve and conserve these intangible assets." *Id.* at 770. The trial court held that if Pacific Mutual had been liquidated, its assets would have been "of substantially less value than if sold as part of a going concern." *Id.*; *see also Carpenter II*, 305 U.S. at 304. The trial court did not specifically determine what policyholders would have received in litigation; the trial court instead found that "under the approved plan, the assets are far in excess of what they would be in liquidation." 74 P.2d at 777.

### b.      *Carpenter I*

Four policyholders noticed appeals. They asserted a variety of challenges under federal and state law. For present purposes, two challenges are relevant. They claimed that the rehabilitation plan impaired their contract rights in violation of the Contracts Clause, and they argued that the plan discriminated unlawfully between holders of cancelable policies and holders of noncancelable policies in violation of the Due Process Clause and the Equal Protection Clause. *Carpenter I*, 74 P.2d at 774. The Supreme Court of California rejected all of the challenges, including these arguments.

First, the Supreme Court of California addressed the challenge under the Contracts

Clause. The court started by explaining that the policyholders could not have expected their

rights to remain inviolate:

> It is no longer open to question that the business of insurance is affected with a public interest. The state has an important and vital interest in the liquidation or reorganization of such a business. Neither the company nor a policyholder has the inviolate rights that characterize private contracts. The contract of the policyholder is subject to the reasonable exercise of the state's police power. The only restriction on the exercise of this power is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory.

*Id.* at 774–75 (citations omitted).

The Supreme Court of California next reiterated that the process of rehabilitating an

insurance company implicated the state's police powers:

> This phase of state control is extremely important. Insurance is a public asset, a basis of credit, and a vital factor in business activity. Obviously, if an insurance company gets into financial difficulties, something must be done to remedy the situation. Either the company must be liquidated, and its assets distributed to its creditors, thus immeasurably injuring many of its policyholders who are thus deprived of insurance protection, or the business must, if possible, be rehabilitated. The public has a grave and important interest in preserving the business if that is possible. Liquidation is the last resort

*Id.* at 775.

The Supreme Court of California then affirmed that the facts of the case supported

rehabilitation over liquidation:

> In the present case the merits of the legislative policy of rehabilitation if possible instead of liquidation is well illustrated. The old company has been doing business in California since 1868. . . . Its life insurance business was on a sound basis and very profitable. Its difficulties were caused almost entirely by reason of inadequate reserves behind its [noncancelable] policies, which was caused by inadequate premium rates based on actuarial under

38

calculations. . . . The company had intangible assets consisting of good will, going concern value, and an extensive agency organization worth several millions of dollars. All these intangible assets would be lost if the old company were liquidated.

*Id.* at 775–76. Importantly for present purposes, the Supreme Court of California called out the implications of rehabilitation for the existing policies: "The old company was powerless to change the existing [noncancelable] policies. The contract and due process clauses prohibited the company from making any changes therein. But these prohibitions do not apply to the state acting under its police powers." *Id.* at 776 (citations omitted). After describing the general outline of the rehabilitation plan, including the options presented to the holders of noncancelable policies, the court held that "[t]his method of rehabilitation by the *formation* of a new company is obviously contemplated by the [California] Insurance Code." *Id.* The court cited a series of cases that had upheld similar structures. *Id.* at 776–77 (collecting authorities).

The Supreme Court of California similarly held that the rehabilitation plan was not unlawfully discriminatory, observing that the answer to this issue and the challenge under the Contract Clause were "interrelated." *Id.* at 774. The court acknowledged that the plan treated traditional policies differently than noncancelable policies by assuming the former in full versus providing holders of the latter with an option to receive reduced benefits. *Id.* at 778. The court found that "the difference in treatment was justified" given that the former policies remained highly profitable while the others brought about the insurers' insolvency. *Id.* The court agreed that the only feasible means of rehabilitating the company involved disparate treatment of the two types of policyholders. *Id.* at 779.

In the holding that would give life to the Liquidation Standard, the Supreme Court of California reasoned in the alternative that the option that the plan provided for a policyholder to receive Liquidation Value eliminated any basis to challenge the plan. To the extent that a policyholder opted to accept a policy from the new company, then that policyholder "clearly enters into a novation with the new company" and could not rely on its prior rights. *Id.* at 777 (citing *Mulcahy v. Baldwin*, 15 P.2d 738 (Cal. 1932)). To the extent that a policyholder opted not to accept a policy from the new company, then the policyholder only possessed the right to receive a payment equal to the value it would receive in liquidation. But a claimant did not have a right to have Pacific Mutual liquidated, and they had no legal cause to complain "simply because the commissioner determined to rehabilitate rather than liquidate." *Id.*

The Supreme Court of California twice stated that providing compensation equal to liquidation value was sufficient to negate any constitutional challenge to the plan: "All that the law requires as to a dissenter is that he receive the liquidation value of his contract rights without unreasonable delay—he has no vested right to immediate payment." *Id.* at 778. To support this proposition, the court cited *Doty v. Love*, 295 U.S. 64 (1935) and *Gibbes v. Zimmerman*, 290 U.S. 326 (1933), which at the time were leading authorities applying the Contracts Clause. The court later reiterated that "[a]ll the dissenter is entitled to is the equivalent of what he would receive on liquidation." *Id.*

The Supreme Court of California concluded that the rehabilitation plan provided the policyholders with an option to receive Liquidation Value, and thus they had no grounds to complain. The Supreme Court of California noted that the trial court had not made a

40

specific finding as to what the policyholders would have received in liquidation, but it

reasoned that such a finding was implicit in the trial court's judgment:

> On these appeals, without the evidence before us, in support of the judgment, we must assume that evidence was introduced on these vital points, and that such evidence demonstrated that dissenters under the plan will receive as much, or more, as they would have received on liquidation. The order appealed from contains a recital that adequate provision is made in the plan for each class of policyholder. We must assume that such recital was amply supported by evidence.

*Carpenter I*, 74 P.2d at 778.

### c.      *Carpenter II*

Displeased with the outcome in *Carpenter I*, the policyholders sought review from

the Supreme Court of the United States. That tribunal issued a writ of certiorari to review

the policyholders' contention that the rehabilitation plan "denies them due process and

impairs the obligation of their policy contracts." *Carpenter II*, 305 U.S. at 303. The Court

affirmed the California court's decision in *Carpenter I*.

The Supreme Court of the United States first took up the argument under the Due

Process Clause. Echoing the *Carpenter I* decision, the Supreme Court of the United States

held that the petitioners

> have no constitutional right to a particular form of remedy. They are not entitled, as against their fellows who prefer to come under the plan and accept the benefits, to force, at their own wish or whim, a liquidation which under the findings will not advantage them and may seriously injure those who accept the benefit of the plan.

*Id.* at 305 (footnotes omitted). For support, the Supreme Court of the United States, like

the Supreme Court of California, looked to *Gibbes*. There, the Supreme Court of the United

States explained that a plaintiff had "no property, in the constitutional sense, in any

41

particular form of remedy; all that he is guaranteed by the Fourteenth Amendment is the preservation of his substantial right to redress by some effective procedure." 290 U.S. at 332. The *Carpenter II* Court reasoned that because the Pacific Mutual claimants were not bound "to accept the obligation of the new company . . . but are afforded an alternative whereby they will receive damages for breach of their contracts. . . . [they] failed to show that the plan takes their property without due process." *Carpenter II*, 305 U.S. at 305.

The court next turned to the claimed violation of the Contracts Clause, disposing of that issue using similar reasoning.

> The argument is that the impairment of contract arises from the less favorable terms and conditions of the new noncancelable policies which are to be substituted for the old ones and, in the case of the life policies, by the substitution of a new company as contractor in place of the old, without the consent of the policy holder. This position is bottomed upon the theory that the policy holders are compelled to accept the new company. . . . As has been pointed out, they are not so compelled but are given the option of a liquidation which on this record appears as favorable to them as that which would result from the sale of the assets and pro rata distribution in solution of all resulting claims for breach of outstanding policies.

*Carpenter II*, 305 U.S. at 305. The Court thus held that there was no unconstitutional impairment of the petitioners' contract rights when the plan provided for a payment of equal to Liquidation Value.

The Supreme Court of the United States implied that if the dissenting policyholders could show that they would receive less than what they would have received in a liquidation, then the petitioners could have advanced litigable challenges to the plan. The Court did not elaborate because the petitioners were "unable to point to any evidence to sustain their contention that if they dissent they will not receive as much in liquidation of

42

their claims for breach of their policy contracts as they would upon a sale of assets and distribution of the proceeds." *Id.* at 304.

#### d.        The Implications Of The Pacific Mutual Decisions

Both of the Pacific Mutual Decisions addressed whether the rehabilitation plan for Pacific Mutual violated constitutional provisions. Both courts held that the rehabilitation plan did not give rise to a litigable constitutional challenge because the plan gave each policyholder the option to receive Liquidation Value. Both courts reasoned that the policyholders' contract rights only enabled them to recover the Liquidation Value, and as long as the plan offered that option, the plan could not create a constitutional issue.

Neither case declared or articulated a bright-line test for rehabilitation plans. Neither court imposed the Liquidation Standard as a per se rule.

Viewed through a contemporary doctrinal lens, the Pacific Mutual Decisions were about standing. Federal courts have developed an extensive body of standing jurisprudence that interprets Article III of the United States Constitution and the limitations it imposes on the scope of federal judicial power. State courts do not face similar limitations and can develop their own standing doctrines, but state law standing decisions often follow federal precedents. *See, e.g.*, *Dover Hist. Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1111 (Del. 2003) (noting that the standards for evaluating standing under federal law "are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware").

In the vast majority of cases, before a plaintiff can sue in its own right, the plaintiff must identify an injury to a legally protected interest. *Oceanport Indus., Inc. v. Wilm.*

*Stevedores, Inc.*, 636 A.2d 892, 903 (Del. 1994); *Gannett Co., Inc. v. State*, 565 A.2d 895, 897 (Del. 1989). The injury requirement is multifaced:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

> (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and

> (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dover Hist.*, 838 A.2d at 1110 (formatting altered and internal quotation marks omitted).

At bottom, the Pacific Mutual Decisions held that the policyholders lacked standing to sue. Because the rehabilitation plan at issue in those cases provided the objectors with Liquidation Value, they lacked any injury in fact that could support a constitutional claim.

Admittedly, the Pacific Mutual Decisions did not use the language of standing, and a Depression-era approach to standing could differ from how courts (and particularly federal courts) would apply the doctrine today. But viewed with the benefit of hindsight and for purposes of a contemporary application, standing is what drove the outcome in the Pacific Mutual Decisions.

Standing is not about the merits. It refers "to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance." *Dover Hist.*, 838 A.2d at 1110. It is concerned "only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy." *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991). As a result, neither of the Pacific Mutual

Decisions provides insight into what the outcome might have been if the objectors had not been able to receive a cash payment equal to Liquidation Value. Both courts implied that such a scenario could have given rise to a claim. In each case, the policyholders argued that Pacific Mutual did not have sufficient assets to provide compensation, or at a minimum that they were deprived of the greater financial strength of the new company. Both courts rejected that argument as a factual matter, noting that the new company had agreed to pay the claim in liquidation of any policyholder who declined to accept a policy from the new company, and that there was no evidentiary support for the contention that a policyholder who chose the liquidation option would not receive Liquidation Value.

Although both decisions implied that a failure to receive Liquidation Value would have meant that a policyholder could assert a claim, neither decision indicated what the outcome on the merits would have been. In *Carpenter I*, the Supreme Court of California strongly endorsed the ability of the state to modify contractual arrangements in an insurance company rehabilitation through the exercise of its police power, stating that "[t]he only restriction on the exercise of this power is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory." *Carpenter I*, 74 P.2d at 775. The Supreme Court of California seems to have approved the rehabilitation under that framework, then relied on the option to receive Liquidation Value as an alternative holding.

The decision in *Carpenter II* provides fewer clues. It is possible that Supreme Court of the United States still would have affirmed the decision approving the plan. The Court repeatedly cited *Doty*, a precedent in which the Court considered a challenge under the

Contracts Clause to the reorganization of a failing bank by the bank superintendent of Mississippi. The plan created a new bank, transferred the assets of the old bank to the new bank, and granted releases to stockholders of the old bank who contributed capital to the new bank. The Court in *Doty* rejected a creditor's challenge under the Contracts Clause, citing a term of the reorganization which required that any profits be used first to pay off the debts of the old firm. 295 U.S. at 72. The *Doty* decision also rejected the creditor's argument that the release impaired its ability to pursue a cause of action, noting that the trial court had found that the new plan made the creditors better off. *Id.* at 73. The citations to *Doty* in *Carpenter II* provide some support for the proposition that the Supreme Court of the United States could have upheld the rehabilitation plan, even if it did not provide Liquidation Value. It is also possible, however, that the Supreme Court of the United States would have held only that the policyholders had the ability to assert a claim, then remanded for the trial court to assess the claim on the merits.

One implication is clear: The Pacific Mutual Decisions do not call for imposing the Liquidation Standard as a bright-line rule. The decisions hold that *if* a rehabilitation plan provides a policyholder with a right to receive Liquidation Value, *then* the plan does not result in any substantial impairment of contract rights that could support a constitutional challenge. Neither case stated affirmatively that providing a right to Liquidation Value is necessary to obtain approval for a rehabilitation plan.

### 2. Later Opinions

In the almost nine decades since the issuance of the Pacific Mutual Decisions, courts in relatively few jurisdictions have considered whether those decisions establish a rule that

requires compliance with the Liquidation Standard as a matter of common law. Courts in four jurisdictions have weighed in: Pennsylvania, Wisconsin, California, and New York. Pennsylvania has the most developed jurisprudence, including a decision from the Supreme Court of Pennsylvania. In Wisconsin, the intermediate appellate court has issued a decision, and the same is true in California. In New York, there is only a single trial court decision.

Of the four, only the New York trial court opinion interpreted the Pacific Mutual Decisions as imposing the Liquidation Standard, and the court reached this conclusion after holding that the proposed rehabilitation plan failed to comply with the statutory priority scheme, rendering the ruling on the Liquidation Standard dictum.

The other three jurisdictions have not interpreted the Pacific Mutual Decisions as imposing the Liquidation Standard. Although early Pennsylvania decisions contain offhand statements that could suggest that view, later Pennsylvania rulings interpreted the Pacific Mutual Decisions as holding that before a claimant can assert a constitutional challenge to a rehabilitation plan, the claimant must demonstrate that the rehabilitation plan did not provide the claimant with Liquidation Value. Without that predicate showing, the claimant lacks the injury necessary to support its objection. Wisconsin and California also have not interpreted the Pacific Mutual Decisions as holding that a rehabilitation plan cannot be approved if a claimant demonstrates that the rehabilitation plan does not provide the claimant with Liquidation Value.

### a.    Pennsylvania

Pennsylvania has the most developed jurisprudence addressing the Liquidation Standard. The development of that jurisprudence involved twists and turns, but ultimately resulted in a clear rejection of the Liquidation Standard as a bright-line requirement.

The Pennsylvania courts first referenced the Liquidation Standard in two decisions issued in the early 1990s, both arising out of the rehabilitation of Mutual Fire, Marine, and Island Insurance Co. ("Mutual Fire"). The Pennsylvania Commonwealth Court at first instance and the Supreme Court of Pennsylvania on appeal both cited *Carpenter II* as contemplating a Liquidation Standard (together, the "Mutual Fire Decisions").[9] But in both decisions, the Pennsylvania Insurance Commissioner (the "Pennsylvania Commissioner") agreed that the rehabilitation plan had to meet the Liquidation Standard, so the test was not in dispute. Moreover, despite referencing the Liquidation Standard as if it were an operative test, neither of the Mutual Fire Decisions applied it as a bright-line requirement for the approval of a rehabilitation plan.

A decade later, in 2002, the Commonwealth Court briefly touched on the Liquidation Standard at the end of a lengthy decision that worked through and rejected a series of objections to a plan of rehabilitation for Fidelity Mutual Life Insurance Company

---

[9] *See Grode v. Mut. Fire, Marine & Inland Ins. Co.* (*Mutual Fire I*), 572 A.2d 798, 805 (Pa. Commw. Ct. 1990) (stating that a rehabilitation plan may be approved "if it does not diminish the rights a creditor would have in liquidation"), *aff'd in part and rev'd in part sub nom. Foster v. Mut. Fire, Marine & Inland Ins. Co.* (*Mutual Fire II*), 614 A.2d 1086, 1093–94, 1099 (Pa. 1992) (citing *Carpenter II* with approval), *certs. denied*, 506 U.S. 1080 and 506 U.S. 1087 (1993).

("Fidelity Mutual"). One of the policyholders contended that the insurer "should not be rehabilitated because policyholders would be better off if the company were liquidated." *Fidelity I*, 803 A.2d at 826. The court noted that the decision to rehabilitate the insurer was subject to review for abuse of discretion, then cited *Mutual Fire II* and *Carpenter II* for the proposition that "[c]reditors and policyholders must fare at least as well under a rehabilitation plan as they would in a liquidation." *Id.* After briefly identifying reasons why the decision to rehabilitate was not an abuse of discretion, the court made even shorter work of the objection based on the Liquidation Standard, stating tersely that "[t]here is no evidence indicating that policyholders have not fared at least as well as they would in liquidation." *Id.* The *Fidelity I* decision only addressed the Liquidation Standard in passing, and it did not examine *Mutual Fire II* or the Pacific Mutual Decisions in any detail.

Four years later, the Commonwealth Court issued another decision in the Fidelity Mutual rehabilitation. *Koken v. Fid. Mut. Life Ins. Co. (Fidelity II)*, 907 A.2d 1149 (Pa. Commw. Ct. 2006). The Commissioner sought approval of a fourth amended plan of rehabilitation. There were no objections to the plan. *Id.* at 1150. The court approved the plan with the following comment: "Under the Plan, contractholders [sic], creditors and mutual members have received or will receive at least as much as they would receive in a forced liquidation, as is required if a rehabilitation plan is to be deemed fair and equitable." *Id.* at 1155 (citing *Mutual Fire II*). Neither the standard nor its application were in dispute, and as in *Fidelity I*, the court in *Fidelity II* only addressed the Liquidation Standard in passing.

It was not until 2012 that the Commonwealth Court issued a decision that addressed a live dispute over the Liquidation Standard. *Consedine v. Penn Treaty Network Am. Ins. Co.*, 63 A.3d 368 (Pa. Commw. Ct. 2012), *aff'd sub nom. In re Penn Treaty Network Am. Ins. Co.*, 119 A.3d 313 (Pa. 2015). The Pennsylvania Commissioner sought to convert two coordinated rehabilitation proceedings into liquidations, arguing that rehabilitation could not be achieved because the Liquidation Standard could not be satisfied. In a lengthy opinion, the Commonwealth Court gave detailed consideration to the Mutual Fire Decisions and the Pacific Mutual Decisions, concluding that they did not impose the Liquidation Standard as a bright-line rule.

Most recently, in 2021, the Commonwealth Court again addressed the contention that the Liquidation Standard operated as a bright-line requirement for the approval of a liquidation plan. *See In re Senior Health Ins. Co. of Pa. Rehab.* (*SHIP*), 266 A.3d 1141 (Pa. Commw. Ct. 2021), *appeal docketed*, No. 71 MAP 2021 (Pa. Sept. 21, 2021). In another lengthy opinion that gave detailed consideration to the Pacific Mutual Decisions, the Commonwealth Court rejected the argument that the Liquidation Standard operated as a bright-line rule.

Because of their significance, this decision provides a detailed discussion of the Mutual Fire Decisions, *Consedine*, and *SHIP*. Because of their abbreviated consideration of the Liquidation Standard, this decision does not engage in further analysis of *Fidelity I* or *Fidelity II*.

50

### i. *Mutual Fire I*

The first Pennsylvania opinion to address the Liquidation Standard was *Mutual Fire I*, issued by the Commonwealth Court in 1990. In that decision, the court approved a rehabilitation plan for Mutual Fire, an insolvent mutual property and casualty insurer whose business predominantly involved reinsurance, but only after making significant modifications to the plan. *Mutual Fire I*, 572 A.2d at 801–02.

The delinquency proceeding began in 1986, when the Pennsylvania Commissioner placed Mutual Fire into receivership with the consent of its board of directors. At the time, Mutual Fire had a negative policyholders surplus of nearly $161 million. *Id.* at 801. The Pennsylvania Commissioner submitted several versions of a rehabilitation plan, which met with objections and other difficulties. The Pennsylvania Commissioner submitted the plan at issue in January 1989. *Id.* at 803.

Various claimants objected to the plan. Many of the objectors relied on *Carpenter II* as imposing a Liquidation Standard, and they contended that the Pennsylvania Commissioner "abused her discretion in fashioning a plan which affords to interested persons less rights than those they would enjoy in a liquidation."[10] In an important concession, the Pennsylvania Commissioner agreed that *Carpenter II* "requires claimants be treated the same or better than in liquidation." *Id.* The court chose not to "belabor this

---

[10] *Id.* at 804; *accord id.* at 803 n.10 (noting that certain objectors relied on *Carpenter II* and contended that the Commissioner "cannot fashion a Plan which does not give a party in rehabilitation the same or greater *rights* than he would have in liquidation").

51

point except to agree with the parties that the Plan must also be viewed in light of this principle." *Id.*

The *Mutual Fire I* decision thus did not hold that the Liquidation Standard necessarily applied to the rehabilitation plan. It was rather a case where the parties did not dispute the point, and the court accepted the parties' stipulation.

Against that backdrop, the *Mutual Fire I* decision addressed a series of specific objections to the plan, and the court's rulings on the objections shed light on the extent to which the court treated the Liquidation Standard as a per se requirement. The first debate concerned whether the plan could impair any of the claimants' contract rights. The court did not view *Carpenter II* as preventing any modifications. Instead, the court explained that the Pennsylvania Commissioner had the power to make reasonable modifications that were necessary to serve an important public purpose:

> The Act and caselaw implicitly recognize that contractual terms are not sacrosanct when an insurance company is insolvent. As in public utilities, the insurance industry is subject to particularly strict regulation by state government because the impact of an insolvent insurer's contracts is not limited to the named parties. This is particularly applicable to the contracts for reinsurance without which Mutual Fire would have been unable to expand its business. Rather, those contracts entered into by Mutual Fire have affected thousands of members of the public. Of course, individual parties to those contracts cannot be expected to protect this public interest. Thus, the General Assembly, pursuant to its inherent police power to safeguard the public interest, has authorized the Commissioner to represent these interests in order to minimize the harm to all affected parties—insureds, creditors and the public generally—from the potentially devastating consequences of insurance insolvency. If the Commissioner determines that rehabilitation, as opposed to liquidation, is the most efficient means of representing these interests, and this Court finds no abuse of her discretion, then contractual impairments that are insubstantial and reasonably necessary to implement a rehabilitation plan cannot be deemed unlawful. An impairment may be constitutional if it is reasonable and necessary to serve an important public

52

purpose. We are convinced that Mutual Fire's rehabilitation serves an important public purpose. Hence, we examine the extent of impairments to determine their reasonableness.

*Id.* at 804–05 (cleaned up). The court thus did not view the Liquidation Standard as requiring that each claimant receive the full measure of what its contract rights would provide in liquidation. Instead, the court examined the "reasonableness" of any contract impairment in recognition of the principle that "[a]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *Id.* at 805 (cleaned up).

When parsing the major objections to the plan, the court made fact-specific rulings on whether the challenged feature of the plan effectuated an unreasonable modification of a contract right. Two warrant discussion.

First, the court evaluated the plan's treatment of setoffs to determine whether those features unreasonably impaired the rights that creditors otherwise would have possessed in liquidation. The court approved the plan's use of the commencement date of the delinquency proceeding as the date for calculating the setoff balances, observing that the same date would have been used to fix the creditors' rights in a liquidation. *Id.* at 805. By contrast, the court rejected the plan's cap on total allowable setoffs, observing that "[t]here is no provision for a maximum setoff allowance in liquidation proceedings, and no legal justification for this restriction." *Id.* The court also struck a provision in the plan that declared Mutual Fire's books and records to be conclusive, finding that "[d]ue to the established inaccuracy of Mutual Fire's records, this condition substantially impairs the objectors' right to an accurate accounting." *Id.* at 805–06. These rulings show that the court compared the claimants' rights under the plan to the rights they would possess in

liquidation, but did not automatically conclude that the rehabilitation plan was problematic if it provided lesser rights. The court had to evaluate the extent of the impairment for its reasonableness.

Second, the court addressed the Pennsylvania Commissioner's allocation of certain claims to particular priority classes. Holders of surety bonds, which the plan placed in Class 5, objected that the plan placed their claims in a lower priority class than other policyholders. The court upheld the placement, finding that the Pennsylvania Commissioner had not abused her discretion by differentiating between the bondholders, who had rights of recourse against third parties, and policyholders, who only had the ability to recover from Mutual Fire or from state guaranty associations.[11]

The holders of surety bonds also objected to the plan's creation of a segregated Class 6 for general creditors, funded by a deposit of 25% of all the reinsurance that Mutual Fire collected. The holders of surety bonds contended that by allocating value to a junior class, the plan impaired their contract rights. The court also approved that feature of the plan,

---

[11] Every state (and the District of Columbia and Puerto Rico) has a life and health insurance guaranty association. The states created this nationwide system to protect policyholders and the public from the harms resulting from insolvent life and health insurance companies. *See, e.g.*, 18 *Del. C.* § 4402; *see also Del. Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1078–79 (Del. 2006); *Reliance Ins. Co. v. Plum Creek Timber Co.*, 2004 WL 838634, at *2 (Del. Super. Apr. 15, 2004). For life insurance policies, the benefits provided by guaranty associations include continuing policies in force and paying death benefits and cash surrender values up to statutory limits. *See, e.g.*, 18 *Del. C.* § 4403.

finding that in a liquidation, the general creditors would have been entitled to Class 5 priority, so the creation of a subordinated class was "well within the Rehabilitator's discretion," did not harm the Class 5 creditors, and did not violate the Liquidation Standard. *Mutual I*, 572 A.2d at 807. Once again, the court did not automatically regard a limitation on a claimant's rights as a problem for the plan. The court instead evaluated the reasonableness of the limitation.

The *Mutual Fire I* decision is thus not a strong precedent for the Liquidation Standard. The parties agreed on its application, so the standard itself was not at issue. The court followed the parties' lead, yet did not apply the Liquidation Standard as a bright-line rule. The court recognized instead that the Pennsylvania Commissioner could make reasonable modifications to claimants' contract rights to the extent necessary for the rehabilitation to be successful, and the court applied that standard when making issue-specific rulings on the plan.

### ii.     *Mutual Fire II*

After the Commonwealth Court issued its decision in *Mutual Fire I*, several claimants appealed. In *Mutual Fire II*, the Supreme Court of Pennsylvania affirmed all of the rulings in *Mutual Fire I*, except for a minor issue involving the right of a single judgment creditor to recover interest, which the Commonwealth Court had not addressed. *See Mutual Fire II*, 614 A.2d at 1093.

For present purposes, the relevant question is what *Mutual Fire II* had to say about the Liquidation Standard. On appeal, certain appellants asserted that the rehabilitation plan was

in violation of [*Carpenter II*], in which the United States Supreme Court held that a rehabilitation plan cannot impose harsher consequences than a liquidation. Under [*Carpenter II*], creditors must fare at least as well under a rehabilitation plan as they would under a liquidation, which Appellants currently argue, would not be the case under this Plan. We disagree and affirm the finding of the Commonwealth Court that this plan properly effectuates the goals of rehabilitation embodied in [Pennsylvania's rehabilitation statutes].

*Id.* at 1093–94. By framing the appellants' argument in this fashion, this excerpt from the *Mutual Fire II* decision appears to interpret *Carpenter II* as imposing the Liquidation Standard. But upon a closer examination, that interpretation is inconsistent with the *Mutual Fire II* decision when read as a whole

First, as the discussion of *Mutual Fire I* demonstrated, the parties agreed that the Liquidation Standard applied, and the Commonwealth Court accepted the parties' agreement. Just as the Liquidation Standard was not at issue at the trial level, it was not at issue on appeal.

Second, the Supreme Court of Pennsylvania affirmed the Commonwealth Court's application of the Liquidation Standard, in which the Commonwealth Court permitted reasonable modifications to the claimants' contract rights that were necessary for the rehabilitation to succeed. On appeal, the Supreme Court of Pennsylvania expressly rejected the assertion that *Carpenter II* foreclosed any modification to the claimant's contract rights, holding that "such impairment is not a *per se* violation of law." *Id.* at 1094. The court explained that

> we must look to the broad powers afforded to the [Pennsylvania] Commissioner granted in order to effectuate equitably the intent of the Rehabilitation statutes, i.e., to minimize the harm to *all* affected parties. As such, she has a fiduciary duty to marshal and preserve all assets of the

insolvent entity. Furthermore, the exigencies attendant to a major commercial insolvency and the goals of rehabilitation necessitate the reality that individual interests may need to be compromised in order to avoid greater harm to a broader spectrum of policyholders and the public.

*Id.* (cleaned up). The Supreme Court of Pennsylvania agreed with the trial court that the impairments imposed by the plan generally were "insubstantial" and fostered "the legitimate public purpose of safeguarding the public interest from the potentially innumerable consequences of Mutual Fire's insolvency." *Id.* at 1094–95.

In a footnote, the court commented on the assertion by certain claimants that the plan's treatment of setoffs impaired their contract rights in violation of the Contracts Clause and its Pennsylvania counterpart. The Supreme Court of Pennsylvania rejected the suggestion that any impairment would constitute a constitutional violation, explaining that the Supreme Court of the United States had established a three-part test to analyze that species of claim. *Id.* at 1094 n.4 (citing *Energy Rsrvs. Gp., Inc. v. Kan. Power & Light*, 459 U.S. 400 (1983)) (the "Energy Reserves Test").

> The threshold inquiry is to determine whether the state statute in reality has operated to substantially impair a contractual relationship. Should it be determined that a substantial impairment has occurred, the state must set forth a legitimate and significant public purpose. Once that purpose is identified, the final inquiry concerns whether the adjustment of contractual rights is reasonable and of a nature appropriate to the public purpose justifying the legislation's adoption; however, if the state is not a contracting party, deference is given to the state's enunciated purpose.

*Id.* (citations omitted). The Supreme Court of Pennsylvania thus did not regard a substantial impairment of contract rights as leading ineluctably to the rejection of the rehabilitation plan. It meant instead that the claimant could attempt to prove a violation of the Contracts Clause.

57

The Supreme Court of Pennsylvania held that the treatment of setoffs in the rehabilitation plan satisfied the Energy Reserves Test:

> The Commonwealth Court properly upheld this portion of the Plan and concluded that in order to achieve the desired consequence of satisfying all claims in an equitable and orderly manner the resulting alleged contract impairments were insubstantial. Furthermore, the significant interest on behalf of the state to regulate the fiscal affairs of its insurers for the welfare of the public would still render the Plan permissible should impairment be found to exist. It is also worthy to note that the objectors to the Plan are members of a highly regulated industry and as such were well aware of the powers of a Rehabilitator. Accordingly, the Commonwealth Court properly dismissed Appellants' challenge to the setoff provision of the Plan under the federal constitution. As [Pennsylvania's] impairment of contract provision mirrors that of the United States Constitution, . . . . we adopt the same test instantly and likewise dismiss the impairment of contract challenge made under the Pennsylvania Constitution.

*Id.*

Through its analysis of the setoff claim, the Supreme Court of Pennsylvania demonstrated that it did not view the Liquidation Standard as a per se rule. The *Mutual Fire II* decision instead shows that *if* the plan impaired a claimant's contractual rights by causing the claimant to receive less than Liquidation Value, *and if* the claimant asserted that the impairment violated the Contracts Clause, *then* the court would apply the Energy Reserves Test to determine if the impairment gave rise to a constitutional violation.

Later in the decision, the Supreme Court of Pennsylvania reiterated these principles when considering a specific challenge to the plan's allowance of setoffs. Certain appellants contended that the plan should not have permitted setoffs at all, because the Pennsylvania statute that authorized setoffs only applied in liquidations. *Id.* at 1095. The Supreme Court of Pennsylvania rejected this argument, holding that the statute also applied to

58

rehabilitations. The court then provided an alternative explanation, explaining that "should the plan of rehabilitation as proposed offer significant benefits in serving the public interest, the discretionary action of the Rehabilitator should be approved absent any arbitrary or manifest abuse of discretion." *Id.* The court held that as a matter of common law, the court could approve a plan that included setoffs in the exercise of its sound discretion. *Id.*

Admittedly, the Supreme Court of Pennsylvania included a stronger reference to the Liquidation Standard when rejecting a challenge by different appellants to a different aspect of the setoff mechanism. That aspect barred insurers from offsetting an obligation to pay premium and was based on a statutory limitation. The appellants argued that the statutory limitation only applied in liquidations and hence they should be permitted to offset their obligations to pay premium. After again rejecting the argument that the setoff statute only applied in liquidations, the Supreme Court of Pennsylvania observed that by prohibiting the setoff of premium, "the provision of the Plan . . . ensures that the creditors herein, at a minimum, will fare at least as well under the rehabilitation as they would in a liquidation proceeding as mandated by the holding of [*Carpenter II*]." *Id.* at 1096. Shorn of context, that sentence seems to say that *Carpenter II* imposes the Liquidation Standard, but the *Mutual Fire II* decision as a whole cuts against that reading.

Like *Mutual Fire I*, the *Mutual Fire II* decision is not a strong precedent for the Liquidation Standard. The parties had agreed on its application, so the standard was not at issue. Moreover, the court did not apply it as a bright-line rule. There are snippets in *Mutual Fire II* that could support that reading, but the decision as a whole used the standard as a

59

predicate test for determining whether a claimant had advanced a viable objection that the court needed to analyze.

### iii. *Consedine*

After the Mutual Fire Decisions, the status of the Liquidation Standard under Pennsylvania law was somewhat unclear. The Mutual Fire Decisions as a whole cut against applying the Liquidation Standard as a bright-line rule, but aspects of those decisions suggested the opposite. The next major Pennsylvania decision, however, put the issue to rest. In *Consedine*, an opinion from 2012, the Commonwealth Court held that the Liquidation Standard did not operate as a requirement that a rehabilitation plan had to meet.

The *Consedine* decision arose out of the receiverships of Penn Treaty Network America Insurance Company and its wholly owned subsidiary, American Network Insurance Company, both of which were Pennsylvania life insurers specializing in long-term care insurance (together, the "Companies"). 63 A.3d at 375. In 2009, the Companies consented to being placed into rehabilitation. They were meeting all of their obligations as they came due, and they had sufficient strength to pay all policyholder obligations on time for years to come. Nevertheless, they were insolvent because they had issued a large number of long-term health care policies (the "OldCo Policies") at rates that became inadequate when long-term care became more widely available and more policyholders made claims. *Id.* at 378, 385–86, 389. Because the policies were underpriced, fewer policyholders allowed their policies to lapse. *Id.* at 389. The future claims associated with the OldCo Policies caused the Companies' long-term contingent liabilities to exceed their assets. *Id.* at 378, 393–94. In the petition, the Pennsylvania Commissioner cited actuarial

60

reports to argue that the Companies could return to financial health by increasing their rates, by offering policyholders reduced benefits, or by offering policyholders a nonforfeiture option in which their policies would continue without additional payment for a period of time, then lapse. *Id.* at 375.

Six months after obtaining the rehabilitation orders, the Pennsylvania Commissioner sought to convert the rehabilitations into liquidations. The Companies' parent corporation and one of its directors intervened to oppose the request. *Id.* at 376.

To obtain an order terminating the rehabilitations and converting them into liquidations, the Pennsylvania Commissioner had to show that continued rehabilitation would substantially increase the risk of loss to policyholders, creditors, or the public or would be futile. *Id.* at 374, 439. The Pennsylvania Commissioner argued that the Companies could not obtain increases from state regulators and that any rehabilitation that involved revising the policies or changing benefit options was a futile exercise because "any rehabilitation proposal that would make any policyholder worse off than he or she would be in liquidation cannot be considered or adopted as a feasible alternative to liquidation." *Id.* at 450 (emphasis removed). The Pennsylvania Commissioner posited that a rehabilitation plan might restore the Companies to solvency by capping aggregate benefits at $350,000 per policy or by limiting coverage to four or five years. Doing so, however, would cause policyholders in some states to receive less than they would in a liquidation, because if the Companies were liquidated, then the guaranty associations would step in and provide statutorily defined coverage which, in some cases, would be more generous than what the rehabilitation plan offered. Put another way, the Pennsylvania

Commissioner asserted that at least some policyholders would fare better if the Companies were liquidated instead of rehabilitated. Thus, the Pennsylvania Commissioner argued that rehabilitation was futile because a rehabilitation plan could not satisfy the Liquidation Standard. As support for the Liquidation Standard, the Pennsylvania Commissioner relied on *Mutual Fire II* and *Fidelity I*. *Id.*

The Commonwealth Court considered and rejected the argument that *Mutual Fire II* had recognized the Liquidation Standard as a rule of law:

> *Mutual Fire II* does not stand for the proposition that every single policyholder, or other creditor, must fare as well in rehabilitation as in liquidation. *Mutual Fire II* stands for the opposite. The Supreme Court held that the goal of rehabilitation is the equitable administration of the assets of the insurer in the interests of investors, the public, the main purpose being the public good. Further, the goals of rehabilitation necessitate the reality that 'individual interests may need to be compromised in order to avoid greater harm to a broader spectrum of policyholders and the public.

*Id.* at 451 (cleaned up).

The Commonwealth Court also explained that *Mutual Fire II* did not rule out benefit reductions, which the parties agreed was a type of contract impairment. The Commonwealth Court explained that under *Mutual Fire II*, "[a] rehabilitation plan is permitted to impair the contractual rights of some policyholders in order to minimize the potential harm to all of the affected parties." *Id.* at 452 (citing *Mutual Fire II*, 614 A.2d at 1094). The court explained that under *Mutual Fire II*, the existence of a contractual impairment was not dispositive, but rather triggered the application of the Energy Reserves Test to determine if the contractual impairment was justified.

The Commonwealth Court next distinguished *Fidelity I*. The Commonwealth Court noted that *Fidelity I* merely referenced the Liquidation Standard and supported it with a citation to *Carpenter II*. The court proceeded to analyze *Carpenter II*, explaining (as this decision has), that *Carpenter II* did not impose the Liquidation Standard as a rule of law. The Supreme Court of the United States instead

> held . . . that there was no impairment of the contracts because there was no evidence that the policyholders would not receive as much on their claims under the plan as they would receive in a liquidation sale of assets and distribution of the proceeds. In short, the objectors in [*Carpenter II*] did not prove impairment. [*Carpenter II*] did not establish the broad principle that a rehabilitation plan is *per se* invalid unless every policyholder will fare as well in rehabilitation as in liquidation.

*Id.* at 452–53 (citations omitted).

Summing up, the Commonwealth Court explained that there was "no statutory provision or case law precedent that requires this Court to grant a liquidation petition unless it can be established that every single policyholder will fare at least as well in rehabilitation as in liquidation." *Id.* at 453. Instead, a party challenging a rehabilitation plan had the burden to show a substantial impairment of a contractual relationship. An insubstantial impairment would not support a claim, and even a substantial impairment could be justified: "[T]he impairment could be considered 'substantial,' but the Court still needs to determine whether (1) the rehabilitator has acted for a legitimate and significant public purpose and (2) the adjustment of contractual rights is reasonable and of a nature appropriate to that public purpose." *Id.*

Applying these legal principles, the Commonwealth Court found that the Pennsylvania Commissioner had not shown that a rehabilitation plan could not be justified.

63

Instead, the evidence suggested several potential options could lead to a successful liquidation, including benefit reductions. *Id.* at 453–55.

The Commonwealth Court's decision in *Consedine* decisively rejected the assertion that the Liquidation Standard operates as a bright-line rule. On appeal, the Supreme Court of Pennsylvania affirmed. Although the senior tribunal expressed doubt that the Commonwealth Court had shown sufficient deference when reviewing the Pennsylvania Commissioner's recommendation, the Supreme Court of Pennsylvania did not offer any criticism of the Commonwealth Court's analysis of the Liquidation Standard

### iv. *SHIP*

The most recent decision to consider the status of the Liquidation Standard under Pennsylvania law is *SHIP*, a detailed decision from the same judge who authored the *Consedine* opinion. Like *Consedine*, the *SHIP* decision rejects the application of the Liquidation Standard as a bright-line rule.

In *SHIP*, the Pennsylvania Commissioner sought approval for a plan of rehabilitation for Senior Health Insurance Company of Pennsylvania ("Senior Health"), a Pennsylvania insurer that principally issued long-term care insurance. In 2020, the Pennsylvania Commissioner placed Senior Health into rehabilitation with the consent of its board of directors. At the time, Senior Health had approximately $1.4 billion in assets and $2.6 billion in liabilities, resulting in a deficit of approximately $1.2 billion (the "Funding Gap"). The major causes of the Funding Gap were initial premium rates based on erroneous actuarial assumptions, poor investment returns, high operating costs, and the inability to obtain approval of actuarially justified rates from state insurance regulators.

64

266 A.3d at 1148. The Commonwealth Court also noted that the state-by-state process for obtaining rate approvals created unfairness across policyholders, because some states approved the requested rate increases in full, others in part, and some not at all. The patchwork result meant that policyholders in different states paid different premiums for the same coverages, with policyholders in states that approved larger increases subsidizing policyholders in other states. *Id.* at 1146.

To close the Funding Gap, Senior Health needed to increase premium income, reduce benefits, or a combination of both. On April 22, 2020, the Pennsylvania Commissioner proposed a rehabilitation plan for Senior Health.

In simplified terms, the rehabilitation plan gave each policyholder a choice among four options:

- Maintain the current premium payment by accepting a policy that provided reduced benefits at a level justified by that premium.

- Maintain the policy coverage by agreeing to pay the actuarially justified premium.

- Accept a modified policy by choosing between two options, each of which provided a new combination of benefits at an actuarially justified premium.

- Choose a nonforfeiture option under which the policyholder would no longer have to pay any premiums and would receive limited benefits supported by the paid-up value of the policy.

*Id.* at 1149–50. The rehabilitation plan sought to address the cross-state inequities by imposing new rates through a final judgment in the rehabilitation proceeding, rather than through state-by-state rate applications. *Id.* at 1170–77.

State insurance regulators from Maine, Massachusetts, and Washington (the "Intervening Regulators") objected to the plan. Among other arguments, they contended

that the plan was unconstitutional because the plan failed to satisfy the Liquidation Standard, relying on *Koken* and *Carpenter II*. *Id.* at 1177–78.

To prove that the plan failed to satisfy the Liquidation Standard, the Intervening Regulators presented a witness who testified that under the rehabilitation plan, policyholders in the aggregate would bear responsibility for the entire Funding Gap of $1.2 billion, which would be addressed through a combination of premium increases and benefit reductions. The witness calculated that in a liquidation, the policyholders in the aggregate would only shoulder $397 million of the Funding Gap, with the guaranty associations stepping in to provide $837 million in benefits. *Id.* at 1162.

The Intervening Regulators also sought to show that the plan failed to satisfy the Liquidation Standard by presenting a witness who quantified the net present value of the coverage that policyholders would receive in liquidation, taking into account the replacement coverage that the guaranty associations would provide. Labeling the result the "*Carpenter* value," the Intervening Regulators compared that value with the net present value of the coverage that policyholders could select under the rehabilitation plan. The witness testified that of the four options that the rehabilitation plan provided, only the option to retain current policy benefits for an increased premium resulted in any policyholders receiving coverage with a net present value greater than what they would receive in liquidation, and that benefit only accrued to 83% of the policyholders. The remaining 17% would receive coverage with a lower net present value than what the policyholders would receive in liquidation. The witness found that the other three options

provided by the rehabilitation plan would result in policyholders receiving coverage with a lower net present value than what they would receive in liquidation.

Presented with the Intervening Regulators' argument and supporting evidence, the Commonwealth Court held that the Liquidation Standard did not establish a requirement that a rehabilitation plan had to meet in order to obtain court approval. *Id.* Relying on *Mutual Fire II*, the Commonwealth Court explained that whether a creditor or policyholder would receive less than Liquidation Value merely constituted part of the threshold showing that a claimant had to make to be able to assert a constitutional challenge to a plan. The court also explained that even if the claimant could show a substantial impairment of its contract rights, "the Court should confirm the plan so long as the Rehabilitator has acted for a legitimate and significant public purpose and the contractual modification is reasonable and appropriate to that public purpose." *Id.* at 1178.

The court rejected the Intervening Regulators' reliance on *Carpenter* value as a basis for showing a substantial impairment of contract rights. The court reasoned that "[t]he value comparison of coverage to [Senior Health] policyholders in a rehabilitation as compared to a liquidation cannot be reduced to dollar amounts." *Id.* at 1179. In reaching that conclusion, the court cited witness testimony to the effect that consumers do not choose policies based on their net present value, but rather based on whether the type and amount of coverage fits the consumer's personal needs. *Id.* The court also noted that if *Carpenter* value was relevant, then the rehabilitation plan would offer more than 80% of Senior Health's policyholders an option with a value equal to or higher than the coverage they would receive in liquidation. *Id.* Of course, if the Liquidation Standard operated as a bright-

line rule, then the same statistic would show that the rehabilitation plan could not satisfy it for approximately 20% of Senior Health's policyholders.

The court also took issue with the Intervening Regulators' comparison between what policyholders would receive in a liquidation and what policyholders would receive in a liquidation *from the guaranty associations. Id.* at 1179. The court stressed that "the Court in *Carpenter* was comparing the cash payment to policyholders under a rehabilitation plan with the cash payment they would receive in liquidation, at a time when there was no guaranty association protection for policyholders." *Id.* In a footnote, the court elaborated on this distinction:

> The judicially created requirement that a rehabilitation must treat policyholders better than would a liquidation pre-dates the creation of guaranty associations. Arguably, guaranty association protection should not be part of that analysis because the associations exist as a matter of legislative grace. Legislatures can repeal the guaranty association statutes or reduce the benefit caps. As it is, there is commonality but not uniformity. In any event, the existence of guaranty association protection was part of the Rehabilitator's analysis and, practically speaking, that protection cannot be ignored. Nor can its cost to other stakeholders, i.e., policyholders of the guaranty associations' member insurers and taxpayers.

*Id.* at 1179 n.21. The *SHIP* court thus believed that any comparison between the rehabilitation plan and a concept of Liquidation Value should calculate the latter based only on the consideration that the entity's assets could generate for claimants; it should not take into account what the guaranty associations might provide.

Admittedly, the first sentence of the court's footnote refers to "[t]he judicially created requirement that a rehabilitation must treat policyholders better than would a liquidation." Taken out of context, that language might suggest that the *SHIP* court

68

acknowledged the existence of the Liquidation Standard as a bright-line requirement. But the balance of the decision demonstrates that the court believed the opposite. The court rejected both the Intervening Regulators' interpretation of the Liquidation Standard and the evidence on which they relied to demonstrate a failure to meet it.

The Intervening Regulators have appealed *SHIP* to the Supreme Court of Pennsylvania. Other state regulators have intervened to support the appeal. A centerpiece of the appeal challenges the Commonwealth Court's separate ruling that the rehabilitation plan could set rates for Senior Health's policies that would be binding under the Full Faith and Credit Clause of the United States Constitution, bypassing the state-by-state rate setting process. The Intervening Regulators have also challenged the Commonwealth Court's interpretation of the Liquidation Standard. The Supreme Court of Pennsylvania has not yet issued a ruling, and for now, both *Consedine* and *SHIP* decisively reject the application of the Liquidation Standard as a bright-line rule.

### b. Wisconsin

Wisconsin is the second jurisdiction to have engaged in detail with the Liquidation Standard. In 2013, Wisconsin's intermediate court of appeals rejected the argument that the Liquidation Standard established a bright-line requirement for a rehabilitation plan.

The Wisconsin decision involved an appeal from the approval of a plan of rehabilitation for Ambac Assurance Corporation ("Ambac"). *In re Ambac Assurance Corp.*, 841 N.W.2d 482, 502 (Wis. Ct. App. 2013). In presenting the plan, Wisconsin's Office of the Commissioner of Insurance (the "Wisconsin Commissioner") demonstrated that 1,000 out of Ambac's 15,000 policies were imperiling its financial stability, and the

plan placed those policies in a segregated account. The plan capitalized the account with a secured note in the amount of $2 billion and an aggregate excess of loss reinsurance agreement. The segregated account could call upon the general account to pay claims, but only so long as the claims did not cause Ambac's assets to fall below a specified threshold. The court found that as a result of these measures, the segregated account had access to approximately 98% of Ambac's assets.

Under the rehabilitation plan, the holders of claims allocated to the segregated account would receive payment of 25% of their claims in cash and 75% in the form of surplus notes with a maturity date of June 2020. *Id.* at 492. The June 2020 maturity date was subject to extension if the Wisconsin Commissioner of Insurance (the "Wisconsin Commissioner") determined it was necessary to "allow for the continuation or reissuance of surplus notes after 2020." *Id.* The Wisconsin Commissioner anticipated that the surplus notes might not be paid until after 2050.

The trial court approved the plan, and various parties appealed. The claimants whose policies were assigned to the segregated account argued that the plan failed to satisfy the Liquidation Standard, and they interpreted *Carpenter II* as holding that if a plan did not provide claimants with Liquidation Value—either under the plan itself or through an opt-out right—then the plan would constitute an unconstitutional taking of property. *Id.* at 502.

The Wisconsin court decisively rejected this argument. After analyzing the Pacific Mutual Decisions in detail, the Wisconsin court concluded that they did not support a bright-line test for rehabilitation plans, but rather had analyzed the merits of the constitutional violations that the claimants in those cases had advanced, each of which

70

required that the claimants show an impairment of contract. *See id.* at 504. The *Carpenter II* decision therefore did not stand for "the broad principle that a rehabilitation is *per se* invalid unless every policyholder will fare as well in rehabilitation as in liquidation." *Id.* (quoting *Consedine*, 63 A.3d at 453)). The court agreed with the Wisconsin Commissioner that (1) "neither [*Carpenter II*] nor any other case provides that rehabilitation plans must afford policyholders the liquidation value of their claims or the right to opt out of the rehabilitation plan and receive the liquidation value of their claims" and that (2) "although an insurance commissioner may choose to structure a rehabilitation plan in that way in the proper exercise of its discretion, the commissioner is not required to include such provisions in a rehabilitation plan." *Id.* at 502.

To identify the governing standard for the rehabilitation plan, the Wisconsin court looked to Wisconsin's insurance statute:

> Wisconsin's rehabilitation statutory scheme does not require that policyholders fare as well in rehabilitation as they would in liquidation. The rehabilitation statutory scheme provides the commissioner with minimal guidance as to how to structure a rehabilitation plan and certainly no requirement that each plan must provide policyholders the liquidation value of their claims, or the right to opt out and receive the liquidation value of their claims. Rather, as we have explained thus far, [the statute] demonstrates the legislature's clear and unequivocal intent to maximize the commissioner's flexibility in formulating a rehabilitation plan tailored to the circumstances of the particular case, which in this case may mean that not all policyholders are treated the same as they would be in liquidation.

*Id.* at 504. The Wisconsin court concluded that this standard was the only test that the Wisconsin Commissioner had to meet.

As a result of the *Ambac* decision, Wisconsin stands with Pennsylvania in rejecting the Liquidation Standard.

71

### c.      California

The third jurisdiction to consider the Liquidation Standard is California. Although many decisions from that jurisdiction have cited the Pacific Mutual Decisions, only one decision has significance for the Liquidation Standard. *See Com. Nat'l*, 17 Cal. Rptr. 2d 884. The *Commercial* decision did not interpret the Pacific Mutual Decisions as imposing the Liquidation Standard as a bright-line rule.

The *Commercial* decision was one of several opinions arising out of the insolvency of Executive Life Insurance Company ("Executive Life").[12] In 1991, the California Commissioner instituted a delinquency proceeding for Executive Life because of losses in its investment portfolio. An early dispute concerned the proper treatment of eight Municipal Bond Guarantee Contracts ("Muni-GICs") that Executive Life had issued to banks that served as indenture trustees for local municipalities that had issued low-income housing bonds. The municipalities turned over the bond proceeds to the indenture trustees, which used the proceeds to purchase the Muni-GICs. The Muni-GICs were effectively single-payment annuities designed to generate a stream of periodic payments, which the indenture trustees used to pay the obligations on the bonds and the construction mortgages for the low-income housing.

---

[12] For example, the parties also cited *Garamendi v. Executive Life Ins. Co.*, 21 Cal. Rptr. 2d 578 (Cal. Ct. App. 1993). That decision involves the assertion of *in rem* jurisdiction over the assets of an affiliate of an insurance company. It does not implicate the Liquidation Standard.

The California Commissioner classified the holders of the Muni-GICs as contractual claimants rather than policyholders, which gave the Muni-GICs a lower priority in liquidation. The Muni-GICs challenged that treatment, and the California Court of Appeals held that that the Muni-GICs were annuities and hence constituted insurance, entitling their holders to the same priority as other policyholders. *See Tex. Com. Bank v. Garamendi*, 14 Cal. Rptr. 2d 854, 857–88, 875 (Cal. Ct. App. 1992).

While that issue was being litigated, the California Commissioner developed a rehabilitation plan that contemplated the sale of substantially all of Executive Life's assets and liabilities to Aurora National Life Insurance Company ("Aurora"), a subsidiary of a third-party insurer, New California Life Holdings, Inc. ("New California"). Aurora would receive an infusion of $300 million in capital from a separate New California subsidiary, and policyholders would receive additional amounts from the guaranty associations in forty-three states. As part of the plan, Aurora would assume liability for all of Executive Life's insurance contracts. Policyholders could opt to continue their policies under restructured contracts or cancel their contracts and receive a payout determined using various formulas. *Com. Nat'l*, 17 Cal. Rptr. 2d at 887–88.

The trial court approved the plan. The holders of the Muni-GICs noticed appeals, as did other claimants. They principally contended on appeal that the rehabilitation plan wrongfully discriminated against their policies and abridged their contract rights by using different and unjustified formulas to value their claims.

To derive the principles that would govern the case, the Court of Appeals conducted an extensive review of *Carpenter I* and its reasoning. The Court of Appeals observed that

73

under *Carpenter I*, the Commissioner had the power to modify insurance contracts. *Id.* at 890. The Court of Appeals observed that "the only restriction on the exercise of the policy power in insurance rehabilitation is that it be reasonably related to the public interest and 'not be arbitrary or improperly discriminatory.'" *Id.* (quoting *Carpenter I*, 74 P.2d at 775).

Using *Carpenter I* as a guide for what was permissible, the Court of Appeals noted that the rehabilitation plan for Pacific Mutual had discriminated among policyholders by providing more liberal terms for holders of life insurance than for holders of accident and health insurance. The *Commercial* court explained that the Supreme Court of California upheld the differential treatment under two alternative rationales. The first rationale relied on the feature of the rehabilitation plan that offered policyholders a choice between accepting the new contract terms or receiving an amount equal to what they would receive in liquidation. As a result, the policyholders could not claim injury. Either they accepted their new status voluntarily, or they received all that the law entitled them to receive. *Id.*

The second rationale was that "discrimination is justified if it is founded on a rational basis related to effectuating a successful rehabilitation." *Id.* The *Commercial* court explained that

> Pacific Mutual's life insurance policies were a profitable book of business, but the noncancelable accident and health policies had brought about the insolvency of the company because they had been issued at insufficient premium rates and could not be cancelled. . . . [T]he only feasible means of saving the insurance business of the company was to give the life policies competitive benefit levels so that they would continue to generate profit and eventually permit elevation of benefit levels for the initially disfavored noncancelable policies. Thus, the disparate treatment of the restructured noncancelable policies was rationally based and recognized as necessary to avoid straight liquidation of the insolvent's business.

*Id.* at 890–91.

Having derived these principles from *Carpenter I*, the Court of Appeals applied them to the rehabilitation plan for Executive Life. The Muni-GICs objected that the rehabilitation plan valued their claims improperly by considering the prices that investors had paid for the bonds that the municipalities had issued. *Id.* at 893–94. That methodology ignored the indenture trustee's ownership of the Muni-GIC annuity and disregarded the premium that the indenture trustee had paid. For other policies, the rehabilitation plan considered the premium that the policyholder had paid. The Court of Appeals rejected the California Commissioner's methodology for the Muni-GICs, holding that it was discriminatory and that, unlike in *Carpenter I*, there was no suggestion that the treatment was "necessary to a successful rehabilitation plan." *Id.* at 894. There also was nothing in the record to suggest that the Muni-GIC annuities had contributed to the insolvency of the company. "Rather, they generated large immediate-premium funds for [Executive Life] and were a relatively high profit product." *Id.*

The California Commissioner argued in response that he had the authority to modify the Muni-GIC contracts by exercising the state's police power. The Court of Appeals agreed with that general principle, but held that the exercise of that authority was "confined to the police power of the state as manifested in the insolvency statutes; it does not extend to independent discretionary powers which transcend the parameters set by those statutes." *Id.* The Court of Appeals reasoned that because the California Commissioner had failed to justify the differential treatment of the Muni-GICs, such as by pointing to some role that the Muni-GICs had played in causing the insolvency or by explaining why the differential

75

treatment was necessary for a successful rehabilitation, he had exceeded his authority. *Id.*

The plan simply "redirect[ed] a part of [the Muni-GICs'] entitlement for reasons unrelated

to effectuation of the rehabilitation plan." *Id.* at 895.

The Court of Appeals also considered an objection advanced by the Muni-GICs (and

the holders of similar products) to the rehabilitation plan's method of determining the

future value of the policies using a guaranteed interest rate specified in the policies. For

policies that did not specify a guaranteed rate, the plan used an implied rate of return based

on investment expectations. The guaranteed rate was much lower than the implied rate and

resulted in a lower valuation. *Id.* at 895–96.

The Court of Appeals acknowledged that the *Carpenter I* standard "does not require

precisely equal treatment in all cases" and that "[t]here are circumstances in which a

different treatment may be justified on the basis of proven necessity to preserve the rights

of all policyholders." *Id.* at 895. The Court of Appeals also recognized that policyholders

had no constitutional right to a particular form of remedy and that their policies were

subject to modification through the reasonable exercise of the state's police power. *Id.* at

897. But the Court of Appeals found that

> no justification is offered for the substantial discrimination produced in this case between substantially similar contracts. It has not been established that the disparate treatment bears any reasonable relationship to the public interest in rehabilitating the insolvent insurer, or that it is necessary to preserve the rights of all policyholders.

*Id.* at 898.

For present purposes, the principal significance of the *Commercial* decision lies in

the fact that the Court of Appeals did not apply the Liquidation Standard as a bright-line

rule. The Court of Appeals viewed the rehabilitation plan as substantially impairing the contract rights associated with the Muni-GICs, but it did not stop there. The Court of Appeals proceeded to review the justifications that the California Commissioner provided for the differential treatment to determine whether they had adequate support in the record. The Court of Appeals found that the California Commissioner either provided no justification for the differential treatment, or that the proffered justifications were not supported. The *Commercial* decision's approach to the Liquidation Standard anticipated how the Pennsylvania and Wisconsin decisions would treat it.

### d. New York

The last jurisdiction to have grappled with the Liquidation Standard is New York. In a 2012 trial-level ruling, the New York Supreme Court interpreted *Carpenter II* as imposing the Liquidation Standard. *See In re Frontier Ins. Co.*, 945 N.Y.S.2d 866 (N.Y. Sup. Ct. 2012). That interpretation provided additional support for the trial court's rejection of the rehabilitation plan proposed by the New York Insurance Superintendent, because the proposed plan did not treat claimants as favorably as they would have been treated in a liquidation. *See id.* The *Frontier* ruling is the only decision that has applied the Liquidation Standard in this fashion.

The *Frontier* ruling addressed a proposed rehabilitation plan for Frontier Insurance Company ("Frontier"). In 2001, the New York Superintendent obtained an order placing Frontier into receivership for purposes of rehabilitation. *Id.* at 867. Nine years later, the court entered an order to show cause requiring the New York Superintendent to report on the status of the rehabilitation, to develop and submit a rehabilitation plan for approval,

and to provide an assessment of how long the continued rehabilitation process would take. *Id.* at 868. Eighteen months later, the New York Superintendent proposed a plan that contemplated an on-going runoff of Frontier's liabilities and additional protections for certain specified "Claims under Policies," defined generally as all claims *except* claims under reinsurance contracts. The plan defined the concept of reinsurance to include claims under surety bonds The plan contemplated another five years of rehabilitation, at which point the New York Superintendent would assess whether Frontier could satisfy all of its Claims under Policies. *Id.*

The plan contemplated paying Frontier's Claims under Policies in full. The plan estimated those claims at $93.2 million and envisioned devoting all of Frontier's $69.9 million in admitted assets, plus earnings and less administrative expenses, to the payment of those claims. The plan estimated that Frontier had liabilities of $24.5 million on surety bonds, reflecting a discount from book value of $100 million. The plan assigned the surety bond claims to a lower priority than the Claims under Policies. The plan did not contemplate making payments on those claims.

The holders of claims under surety bonds objected to the plan. They contended that the surety bonds were entitled to the same priority as the Claims under Policies and that by assigning the surety claims to a lower priority, the plan violated New York's statutory priority scheme. They also alleged that by not permitting the surety claims to recover ratably with the Claims under Policies, the plan failed to satisfy the Liquidation Standard. *Id.* at 869.

When describing the claimants' argument, the *Frontier* decision referred to *Carpenter II* as if it imposed the Liquidation Standard as a bright-line rule. The court wrote: "[A] number of Interested Parties assert that the Plan does not comply with [*Carpenter II*], which requires a plan of rehabilitation to provide claimants with no less favorable treatment than they would receive in liquidation." *Id.* The court's language did not clearly distinguish between what the objectors were arguing and what the court regarded as the rule of law.

The New York Supreme Court viewed the challenges under the priority statute and the Liquidation Standard as two sides of the same coin. The court started with the priority statute and, after extensive analysis, concluded that the statute required that the surety bond claimants receive the same priority as the Claims under Policies. *Id.* at 870–74. The court therefore concluded that the plan violated the priority statute because it assigned the surety claims and the Claims under Policies to separate classes. *Id.* at 875.

Having reached this conclusion, the court returned to the Liquidation Standard, this time treating *Carpenter II* as if it imposed a bright-line rule. In the court's words,

> Having determined that surety claims are entitled to class two priority in liquidation, the Court concludes that the proposed Plan of Rehabilitation accords surety claimants with less favorable treatment than they would receive in liquidation, in contravention of *Carpenter* and the principles of federal constitutional law articulated therein. While the Court recognizes the deferential standard of review applicable to the Rehabilitator's actions, a plan of rehabilitation cannot be approved where it is inconsistent with the law.

*Id.* at 875–76. The court therefore declined to approve the plan and remitted the matter to the New York Superintendent so he could determine whether to liquidate Frontier or attempt to formulate a legally compliant rehabilitation plan. *Id.* at 876.

Because the *Frontier* court found that the rehabilitation plan violated New York's priority statute, the court did not have to reach the constitutional issue under *Carpenter II*. The decision's analysis of the Liquidation Standard is therefore dictum. Nevertheless, the New York Supreme Court proceeded as if *Carpenter II* had imposed the Liquidation Standard as a bright-line requirement that a rehabilitation plan must satisfy to obtain court approval. The *Frontier* opinion is the only decision to reach that result, and in a subsequent decision in a different insurance company proceeding, the New York Supreme Court approved a rehabilitation plan without referencing the Liquidation Standard. *See ABN AMRO Bank N.V. v. Dinallo*, 962 N.Y.S.2d 854 (N.Y. Sup. Ct. 2013).

### 3. The Conclusion From The Caselaw

The preceding tour of the caselaw establishes two points. First, the Pacific Mutual Decisions do not impose the Liquidation Standard as a bright-line rule. Second, a majority of the jurisdictions to consider the Liquidation Standard do not apply it as a bright-line rule. On the latter point, it is noteworthy that the opinions which have analyzed the Pacific Mutual Decisions in the greatest detail—*Consedine, SHIP*, and *Ambac*—expressly reject the bright-line interpretation. And *Commercial*, another decision that analyzed the Pacific Mutual Decisions extensively, did not apply the Liquidation Standard as if it were a bright-line rule.

Based on the foregoing review of common law authorities, the Liquidation Standard is not a common law requirement that a rehabilitation plan must meet. Instead, if a plan fails to provide a claimant with Liquidation Value, then a claimant will have standing to

advance constitutional challenges to the plan, which the court must analyze under the standards that govern each type of challenge.

## D. Secondary Sources

A final place to look for support for the Liquidation Standard is in secondary sources. Neither side places significant weight on secondary authorities, and none are persuasive.

One secondary source is a legal encyclopedia, *Corpus Juris Secundum*, which states: "[A] rehabilitation plan cannot impose harsher consequences than liquidation, and creditors must fare at least as well under the rehabilitation plan as they would under liquidation." 44 C.J.S. *Insurance* § 270, Westlaw (database updated Mar. 2022). As support for this ostensibly black-letter rule, the encyclopedia cites only *Mutual Fire II*. This decision has discussed *Mutual Fire II* and shown that the case does not provide persuasive support for such a proposition.

Another secondary source is a treatise which recites that a claimant cannot object to a decision to rehabilitate as opposed to liquidate because the claimant "has neither a vested right nor a property right in the constitutional sense in the proposed remedy. All that the law requires is that the creditor or policyholder receive the liquidated value of his contract rights without any unreasonable delay." 1 Couch on Insurance § 5:29 (3d ed.), Westlaw (database updated Dec. 2021). As support for this proposition, the treatise relies on *Carpenter I*. To the extent that this passage implies that a policyholder must receive Liquidation Value, this decision has shown that such an assertion would overstate the holding of *Carpenter I*.

A final secondary source is the *Receiver's Handbook for Insurance Company Insolvencies*, published by the NAIC. That source states that rehabilitation plans "should not treat creditors less favorably than they would be treated in liquidation." Nat'l Ass'n of Ins. Comm'rs, *Receiver's Handbook for Insurance Company Insolvencies* 498 (2021). As support, the handbook cites Section 403(c) of the IRMA, Section 12 of the IRLA, and Section 2(2) of the Uniform Act. As this decision has shown, only the IRMA requires compliance with the Liquidation Standard. The IRLA and the Uniform Act do not, and those statutory citations do not support the proposition being asserted.

The secondary sources do not add meaningfully to the analysis. They make overly definitive assertions about the Liquidation Standard, and they support those assertions with citations to authorities that either do not provide the necessary support or which are significantly more nuanced. For purposes of determining whether a court should impose the Liquidation Standard as a common law rule, the secondary sources are best ignored.

E.     **Public Policy**

Lacking a statutory mandate, convincing common law authority, or persuasive secondary sources, the Proponents advance public policy arguments. Those arguments have considerable force, and a legislator considering whether to impose the Liquidation Standard might well find them convincing. But they do not provide sufficient grounds for imposing the Liquidation Standard as a common law requirement.

First, the Proponents contend that the Liquidation Standard promotes stability in the insurance marketplace by providing a predictable, bright-line rule. They maintain that granting discretion to the Commissioner to elevate the interests of some claimants over

82

others, or to impose greater hardships on some claimants, creates uncertainty and will generate negative consequences for the insurance markets.

The Proponents point to the Plan as an example. They maintain that some and perhaps all cedents will fare materially worse under the Plan than they will in liquidation, and they argue that the retrocessionaires cannot yet know how they will fare. Dkt. 610 at 3–4. They fear the implications of particular actions that the Commissioner may take, and they characterize the potential for some claimants to bear more burden than others as involuntary "asset shifting" between groups of claimants. They anticipate that the disfavored claimants could themselves become distressed, with knock-on effects for the insurance market as a whole. *See* Dkt. 633 at 8–9.

The Proponents express particular concern about the implications for guaranty associations. Whether the guaranty associations provide benefits depends in part on the nature of the delinquency proceeding. If an insurer is in liquidation, then the association "shall" provide benefits. *See, e.g.*, 18 *Del. C.* § 4408(b). If an insurer is in rehabilitation, then a guaranty association "may" provide benefits. *See, e.g.*, *id.* § 4408(a). The guaranty associations thus provide a mandatory floor of benefits that policyholders receive when an insurer is in liquidation, but that policyholders may not receive in a rehabilitation.[13]

---

[13] The Council adds that failing to apply the Liquidation Standard might result in a plan violating a provision in the Insurance Code establishing a priority of claims, 18 *Del. C.* § 5918(e). Dkt. 633 at 8. That is not a valid criticism. As this court has explained, the abuse-of-discretion standard requires statutory compliance. *See Pre-Plan Payments*, 2022 WL 971941, at *11–13.

The guaranty associations fund their coverage obligations through assessments on healthy companies and through statutory claims to the remaining assets of insolvent insurers.[14] The Proponents worry that if a rehabilitation plan need not meet the Liquidation Standard, then guaranty associations might opt not to provide guaranty funds in a rehabilitation, because the Commissioner could design a plan that would prevent the guaranty associations from accessing the remaining assets of the insurer. Dkt. 633 at 12.

Second, the Proponents argue that for Delaware to adopt the Liquidation Standard would promote nationwide and international uniformity by causing the same test to apply across jurisdictions. *See id.* at 9. That argument overstates matters, because this decision has shown that for purposes of state-law liquidation proceedings, a prevailing approach does not exist. But for Delaware to adopt the Liquidation Standard would promote uniformity with the Bankruptcy Code and other statutory schemes for distressed financial entities, as well as with the few jurisdictions that have adopted the IRMA.

Third, the Proponents denigrate any standard of review that does not include the Liquidation Standard as failing to impose meaningful constraints on the Commissioner's discretion. They fear a discretionary test in which the Commissioner could pursue his personal vision of the public good. They claim that the court would have no basis to

---

[14] *See, e.g.*, 18 *Del. C.* § 4408(k) (subrogation and assignment rights against insolvent insurer); *see also id.* § 4409 (assessment authority over all licensed life insurers); *id.* § 4414(c) ("[T]he Association shall be deemed to be a creditor of the impaired or insolvent insurer . . . ."); *id.* § 5911(c)(1) (obligation of receiver to seek an order to disburse assets from an insolvent insurer to guaranty associations within 120 days after "a final determination of insolvency").

determine whether the Plan was in the public interest other than to defer to the Commissioner's judgment, and they say that the court also would not have any scale to use in weighing impairments to some claimants' contract rights against the benefits to other claimants and the public. Dkt. 610 at 29–31.

Finally, the proponents question a discretionary standard that would permit the Commissioner to rehabilitate a reinsurer that entered run-off more than a decade ago, whose parent entities are in bankruptcy, and which has no reasonable prospect of writing new business. *Id.* at 3–4. They argue that an insurance regulator should not be empowered to "artificially keep[] insurers in rehabilitation when they really belong in liquidation." Dkt. 633 at 4. They maintain that applying the Liquidation Standard as a bright-line rule will cause the Commissioner to move more quickly to liquidate insurers that should not be rehabilitated, with the decision turning on whether a rehabilitation can generate more than Liquidation Value.

The Commissioner and the Objecting Retrocessionaires respond to these policy concerns by taking a fundamentally different view of the broad discretion afforded to the Commissioner. They view that discretion as a feature, not a bug, because it allows the Commissioner to address the causes of an insurance company delinquency without being constrained by bright-line rules. That discretion, they say, enables the Commissioner to tailor a solution to address the unique features of each insurance receivership.

There is certainly value in having an expert state official exercise judgment regarding the challenging task of rehabilitating or liquidating a delinquent insurer. The Commissioner is a public official, chosen through a state-wide election, and charged with

85

exercising the authority conferred by the Insurance Code and other statutes. The specialized nature of the insurance industry and the complexities of regulating insurers call for a specialized state regulator, and the Commissioner and the Department of Insurance necessarily develop expertise in these tasks over time. In the abstract, one's view of whether the Liquidation Standard would impose a beneficial constraint on the Commissioner's discretion depends to a large extent on the degree to which one has faith in the Commissioner's judgments and in the court's ability to exercise oversight.

The Commissioner and the Objecting Retrocessionaires also maintain that the abuse-of-discretion standard is a meaningful constraint on the Commissioner's discretion. When applied in the manner articulated recently by this court, that is true. *See Pre-Plan Payments*, 2022 WL 971941, at *11–15. Under that standard, the Plan must comply with law, and the court exercises plenary review over whether the Plan satisfies the pertinent legal requirements. *Id.* at *13. The Commissioner also cannot simply claim in conclusory fashion that the Plan serves the public interest to a degree sufficient to warrant impairing certain claimants' contract rights. The Commissioner will have to provide rationales for his determination, and those rationales must have substantial evidentiary support. *Id.* at *14. Once the Commissioner has made the necessary showing, then the court will defer to the Commissioner's judgment and only review them for abuse of discretion. *Id.* at *15.

If the public policy concerns pointed decisively, even strongly, in favor of the Liquidation Standard, then the court might be convinced to adopt it as a common law requirement. But the balancing of competing policies is not clear. I personally find the Proponents' policy rationales more convincing, particularly those grounded in (1)

86

predictability, (2) the benefits of uniformity across statutory schemes, and (3) the advantages of steering delinquency proceedings towards liquidation if the rehabilitation cannot generate greater value for claimants than a liquidation. The fact that this delinquency proceeding has stretched into its third year, with the concomitant burdens on cedents and retrocessionaires, suggests that a more structured approach could be beneficial. It is also not clear to me how unique each delinquency proceeding really is. Doubtless each insurer has idiosyncratic attributes, but there are also many similarities. Recurring patterns clearly exist, and regulators seem to draw on a relatively standard toolkit.

While I personally see value in a regime that incorporates the Liquidation Standard, reasonable minds could disagree. That is likely why the regimes that employ the Liquidation Standard generally do so by statute. Whether to impose the Liquidation Standard as a bright-line rule is more appropriately left to the General Assembly.

## F.     The Resulting Role Of The Liquidation Standard

Based on the foregoing analysis, the Liquidation Standard does not operate under Delaware law as a bright-line requirement that the Commissioner must meet. Put differently, to obtain court approval for the Plan, the Commissioner will not have to show that each claimant will receive at least Liquidation Value.

Instead, a claimant that seeks to object to the Plan as violating the Contracts Clause or some other constitutional provision must show that the Plan does not provide the claimant with Liquidation Value. Without that initial showing, the claimant cannot point to a legally cognizable injury that is sufficient to give the claimant standing to object.

87

As demonstrated by the Pacific Mutual Decisions, the Commissioner can seek to foreclose constitutional challenges by proving that the Plan meets the Liquidation Standard. The Commissioner can achieve that outcome by demonstrating to the court, under an abuse-of-discretion standard, that the Plan itself generates that outcome. Alternatively, the Commissioner may build in a right for claimants to opt out of the Plan and receive a package of consideration equal to Liquidation Value.

## G. The Implications For The Informational Disputes

The dispute over the Liquidation Standard grew out of informational disputes. Having ruled on the role of the Liquidation Standard, this decision can now provide the parties with a framework for addressing those disputes.

By analogy to the standard for evaluating the sufficiency of a Chapter 11 disclosure statement, the Commissioner has an obligation to provide all interested parties, defined as those affected by the Plan, with adequate information to make an informed judgment about the merits of the plan and whether or not to object. *See In re A.H. Robins Co., Inc.*, 163 F.3d 598, 1998 WL 637401, at *3 (4th Cir. Aug. 31, 1998) (TABLE) (per curiam). The concept of adequate information means information of a kind and at a level of detail sufficient to enable a hypothetical member of the relevant class of claimants to make an informed judgment about the Plan. The standard necessarily takes into account the extent to which it is reasonably practicable for the Commissioner to provide the information in light of the nature and history of the delinquent insurer's business and the condition of its books and records. *Cf.* 11 U.S.C. § 1125(a) (providing the Bankruptcy Code's definition of "adequate information").

Whether the Plan provides each claimant with Liquidation Value is critical to enabling an interested party to determine whether or not to object. The Commissioner need not provide each interested party with a dollar value of what they would receive in liquidation versus what they would receive under the Plan, but the Commissioner must provide sufficient information so that claimants can evaluate those issues for themselves.

To seek formal approval of the Plan, the Commissioner will file a motion specifically seeking that relief. The Commissioner will attach the plan as an exhibit, and support its motion with a disclosure document containing the information that the Commissioner believes is sufficient to enable parties to evaluate whether or not to object. In presenting information in support of the Plan, the Commissioner will not refer back to and attempt to incorporate by reference the information it has provided to date, then provide supplemental information. Parsing through that record will be too difficult for interested parties and the court. The receiver will produce a single document that collects and organizes all of the information provided previously, then supplements it with whatever additional information is warranted.

In response to that document, interested parties may file objections and seek discovery. At the conclusion of the discovery phase, the receiver will file an opening brief arguing in favor of the adoption of the Plan, supported by a factual record consisting of affidavits and documentary evidence sufficient to establish a *prima facie* case for plan adoption. The objectors will file their oppositions, and the receiver will reply. An evidentiary hearing on the Plan will follow.

## III.    CONCLUSION

The Commissioner will not have to demonstrate that the Plan satisfies the Liquidation Standard to obtain court approval for the Plan. Whether a claimant has received less than Liquidation Value remains significant, because it affects a claimant's standing to object to the Plan. Because of the importance of that question, the Commissioner must provide information sufficient to enable a claimant to assess whether the Plan will provide Liquidation Value. Supplying that information is part of the Commissioner's obligation to provide claimants with information sufficient to determine whether or not to object.